KIRBY McINERNEY LLP
Ira M. Press (*pro hac vice*)
David Bishop
Sarah G. Lopez (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone:   (212) 371-6600
Facsimile: (212) 751-2540
*Plaintiff's Counsel and Lead Counsel for Lead Plaintiff*

GLANCY BINKOW & GOLDBERG LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:  info@glancylaw.com
*Plaintiff's Counsel and Liaison Counsel for Lead Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEMENT & CONCRETE WORKERS DISTRICT COUNCIL PENSION FUND<br><br>Plaintiff<br><br>v.<br><br>HEWLETT PACKARD COMPANY, and MARK A. HURD,<br><br>Defendants | CIVIL ACTION No. 12-CV-04115 (PJH)<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# I.          THE ACTION

Plaintiff, on behalf of itself and all others similarly situated, upon personal knowledge as to plaintiff and its acts, and as to all other matters upon information and belief based upon, inter alia, the investigations of Plaintiff's counsel, states the following:

1.          This is a securities fraud class action brought on behalf of all persons and entities that purchased the common stock of Hewlett-Packard Company ("HP" or the "Company") between November 13, 2007 and August 6, 2010, inclusive (the "Class Period") and held those shares as of the close of trading on August 6, 2010.  The action asserts claims against HP and HP's former CEO, Mark A. Hurd ("Hurd") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

2.          HP is a technology solutions provider to consumers, businesses and institutions globally, whose offerings span IT infrastructure, global services, business and home computing, and imaging and printing.

3.          In 2006, a scandal involving an unethical investigation into potential information leaks at HP that implicated several HP executives and members of HP's board of directors resulted in the ousting of many of HP's top leadership, the criminal prosecution of HP's then Chairman and General Counsel, and several other government investigations into the Company.  In the wake of that 2006 scandal, HP and Hurd, in the attempt to restore the trust of the public, HP's employees and the market, explicitly committed HP and its employees, executives and board of directors to conducting business in accordance with the highest ethical standards.

4.          In the wake of this 2006 scandal and shakeup of the HP's executive leadership, and in an effort to restore trust, HP appointed a former U.S. prosecutor to perform a forward looking and independent review of investigative methods and HP's Standards of Business Conduct Processes and make future recommendations about best practices.  An updated version of HP's Standards of Business Conduct Guide ("the SBC") was issued in March 2008 incorporating these recommendations.  Included with the SBC was a message from the then CEO, Mark Hurd seeking a

1  commitment of all HP employees to "conduct business consistent with the high ethical standards
2  embodied within [the SBC]."

3      5.      However, even before issuing the SBC, HP had well-established policies: prohibiting
4  Sexual Harassment; requiring honesty and accuracy in expense reporting; directing the appropriate
5  use of HP's sensitive or confidential information; and directing the appropriateness of providing or
6  receiving gifts, favors, and entertainment in a business context.

7      6.      In the fall of 2007, Jodie Fisher was hired as an independent contractor to assist
8  during HP executive events.  Fisher was contracted to introduce important HP customers to Hurd at
9  HP receptions held at hotels throughout the world.

10     7.      Fisher and Hurd met in this capacity in numerous cities around the world from
11 autumn 2007 to autumn 2009, when for unclear reasons, Fisher stopped contracting with HP. As
12 HP's internal investigation of the pair's relationship later revealed, Hurd and Fisher frequently
13 stayed in the same hotels and dined together after marketing events.  On at least a half-dozen
14 occasions, Hurd filed expense reports falsely naming his bodyguard as his dining companion when
15 in fact he had dined with Fisher alone.  And on at least two occasions, Hurd expensed meetings with
16 Fisher in cities where no events were held.  The first of these trips occurred on Feb. 11, 2008, when
17 the pair stayed in a hotel near San Diego where no HP event took place.  Around the same time as
18 that trip, in March 2008, Hurd allegedly revealed details to Fisher about HP's confidential
19 negotiations with Electric Data Systems ("EDS").

20     8.      On June 29, 2010, Fisher's attorney sent a letter to HP's Board of Directors alleging
21 sexual harassment claims against Hurd and HP.  The letter included additional allegations of Hurd's
22 misconduct.   The letter prompted the Board to conduct an internal investigation of Fisher's
23 allegations.  Hurd initially lied to investigators about the nature of the relationship he had with
24 Fisher and lied about knowing about Fisher's prior work in adult films.  The internal investigation
25 revealed that Hurd submitted inaccurate expense reports which obscured the true nature of his
26 relationship with Fisher.

27
28

AMENDED COMPLAINT

9.      At all times during the Class Period Hurd knew or recklessly disregarded the fact that his dealings with Fisher violated standards of conduct set forth in the SBC or the related HP policies that preceded the SBC.

10.     Moreover, Hurd knew or recklessly disregarded the fact that his expense reports did not accurately reflect that Fisher, rather than his bodyguard, was his dinner companion.  Hurd was aware that falsifying business expenses violated HP policies.

11.     Throughout the Class Period, HP and Hurd issued statements regarding ethical standards with which its employees and officers needed to comply.  These statements implied that Hurd was in compliance with the standards he was mandating HP employees and officers to adhere to.  Moreover, HP's Class Period 10-Ks and 10-Qs specifically identified as a risk factor to its continued performance, its ability to retain key employees, including executives. Absent from this statement of risk was a disclosure of Hurd's unethical conduct or that his continued employment was jeopardized by his activities that violated HP policies.  Moreover, HP incorporated this statement of the risk of the loss of key employees posed to HP's success by reference in its Class Period prospectuses and registration statements.  Similarly absent from these 10-Ks and 10-Qs is a disclosure of Hurd's unethical conduct or a disclosure that his continued employment was jeopardized by his activities.

12.     Given HP's reliance on key management executives, the loss of the CEO, would be expected to have a material negative impact on HP's business operations and its business success.

13.     Further, in the aftermath of the 2006 scandal, it was clear that senior managements' adherence to ethical standards in the course of conducting business and their continued tenure in senior management positions were integral to HP's investment value.

14.     As detailed below, Hurd's undisclosed and unethical acts had the direct effect of fraudulently inflating the price of HP's shares. Hurd's undisclosed, fraudulent and improper acts exposed HP to material liabilities – including fines and penalties; increased legal, regulatory and compliance cost; and potential and actual loss of business – of which plaintiff and the Class were unaware.  Hurd's conduct also jeopardized his ability to continue as CEO.

15.     HP's share price fell sharply in response to the disclosure of Hurd's misconduct and the resignation that resulted from the Company's disclosure of this conduct.  The first day of trading after Hurd's resignation, HP's shares lost more than 8% of their value, falling from $46.30 per share on August 6, 2010 to close at $42.50 per share on August 9, 2010.  HP's share price continued to fall over the next few trading days and HP's closing share price on August 13, 2010, one week after the announcement of Hurd's resignation, was $40.45 representing a 12.6% drop in value.

## II.      JURISDICTION AND VENUE

The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District. HP has its principal place of business at principal executive offices located at 3000 Hanover Street, Palo Alto, California, where the day-to-day operations of the Company are directed and managed.

17.     In connection with the acts, conduct and other wrongs complained of, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

## III.      THE PARTIES

18.     Court-appointed Lead Plaintiff Retail Wholesale & Department Store Union Local 338 Retirement Fund ("Local 338 Retirement Fund") purchased HP securities during the Class Period, as detailed in the attached certification, and was damaged thereby.

19.     Defendant HP is a Delaware corporation with its principal executive offices located at 3000 Hanover Street, Palo Alto, California.  HP is a technology solutions provider to consumers, businesses and institutions globally, whose offerings span IT infrastructure, global services, business

and home computing, and imaging and printing. HP's stock is traded in an efficient market on NYSE under the ticker symbol "HPQ."

20.     Defendant Hurd, a citizen of California, served as the Company's Chairman of the Board, President, CEO, and as a Company director until his resignation on August 6, 2010.  Hurd began serving as a director and executive at the Company in April 2005, and became Chairman of the Board in September 2006.

21.     By reason of his position as the Company's Chairman of the Board, President, CEO, and as a Company director, Hurd had access to material inside information about HP and was able to control directly or indirectly the acts of HP and the contents of the representations disseminated during the Class Period by or in the name of HP.  HP and Hurd are collectively referred to herein as "Defendants."

## IV.   BACKGROUND: IN WAKE OF 2006 SCANDAL HP ASSERTS IMPORTANCE OF KEY EXECUTIVES TO ITS SUCCESS AND ASSERTS ITS STANDARD OF INTEGRITY TO WHICH ALL EXECUTIVES AND EMPLOYEES ARE SUBJECT

22.     In 2006, former HP director Tom Perkins informed several government agencies of HP's practice of hiring of detectives who used pretexting and tracer software to obtain the phone records and e-mails of certain HP directors and HP employees, as well as outside journalists, in order to identify insiders who leaked company information to the press.  The story exploded in the media and led to the departure and criminal prosecution of then HP Chairman Patricia Dunn and HP General Counsel Kevin Hunsacker.  Although Hurd had been HP's CEO since 2005, and was aware of aspects of the internal leak investigation, he emerged with his reputation for integrity not only intact, but made all the stronger for it.

23.     Although there was much media coverage of the pretexting scandal, HP shares remained buoyant during September 2006 and October 2006 in light of the concurrent disclosures of HP's increase in profitability of its main business and its capture of increased market share. Hurd is credited with implementing these strategies that resulted in HP's turnaround.  For example, a Wall Street Journal Article published on September 28, 2006, reported that despite a boardroom scandal Wall Street was looking favorably upon HP's shares because most of HP's core businesses have

1   become profitable and in some cases taken market share away from competitors since Chief

2   Executive Officer Mark Hurd joined the company in March 2005.  The article cites a Bear Stearns

3   analyst stating "We like the steps that Mark Hurd has taken to reshape the management team,

4   improve morale and cut costs."

5       24.     However, to the extent that Hurd's continued leadership at HP was questioned, the

6   market considered that information material to HP's investment value.  For example, on September

7   21, 2010 when Hurd was temporarily implicated as a potential target in the pretexting scandal, there

8   was an immediate 5.19% drop in HP's stock price.  This was the first time HP's stock price fell

9   significantly since the revelations regarding the pretexting scandal began in early September 2010.

10  Moreover, with respect to the pretexting scandal, an analyst from Sanford C. Bernstein & Company

11  commented "to the degree it impacts the C.E.O., that is something we are nervous about."

12      25.     In September 2006, after the announcement that Hurd would replace Dunn as

13  chairman in conjunction with his CEO position, Hurd took the lead in restoring the public's trust in

14  HP's integrity.  In testimony in front of Congress, press releases and briefings for investors, and

15  public letters to HP employees, Hurd repeatedly emphasized HP's high expectations for employees

16  at every level. Further, he consistently stressed the seriousness of improper disclosures by company

17  officials.  Accordingly, investors could have easily interpreted the following statements by Hurd to

18  mean that he fully understood HP's Standards of Business Conduct and would not tolerate violations

19  by any employee - let alone himself.

20      26.     In the wake of this pretexting scandal, a letter was sent on September 12, 2006 to HP

21  employees with separate sections authored by Dunn and Hurd.  Relevant highlights from this letter

22  dated September 12, 2006, included the following statements:

23          (A)     "Mark Hurd will assume the responsibility of integrated role of CEO and

24  Chairman of the Board. I will continue to serve as a director. I believe this is the right move in order

25  to reflect the value of accountability that is so important to Hewlett-Packard…. In this instance, the

26  HP board made the decision to integrate the roles based on Mark's proven leadership and his ability

27  to unify the board and build trust. In addition, the board is fully confident in his commitment to the

28

6
AMENDED COMPLAINT

1  highest standards of governance and the appropriate sharing of responsibilities between the CEO and

2  the Board." (Dunn);

3          (B)     "The HP Standards of Business Conduct is our code of ethics. They

4  encompass the basic principles that govern our ethical and legal obligations to HP. Any violations of

5  our standards are unacceptable to Hewlett-Packard and we will take appropriate action."(Hurd);

6          (C)     "We will continue to live HP's values that govern and guide our behavior.

7  These have not changed and will not change:

8                          -       We have trust and respect for individuals;

9                          -       We conduct our business with uncompromising integrity."

10                 (Irrelevant values omitted) (Hurd);

11         (D)     "Our employees and the values we hold are what make HP a special company

12 to do business with and a special place to work. My belief is these values will be strengthened, not

13 diminished, as a result of these issues." (Hurd);

14         (E)     "Be assured we will do what is needed to move through this and continue our

15 work to build the world's leading information technology company" (Hurd).

16         27.     Hurd made additional statements in press releases and briefings that in the wake of

17 the pretexting scandal emphasized HP's high standards of business conduct and the Company's

18 unwillingness to tolerate behavior by employees, executives or board members that do not comport

19 with this high standard:

20         (A)     "HP holds itself to the highest standards of business conduct and we are

21 accountable to these standards for everything that we do. The company will work to put these

22 matters behind us so that we fully resume our focus on the business and continue to earn the trust

23 and support of our customers, employees and stockholders." (HP press release: "Board Appoints

24 Mark Hurd As Successor," Sept. 12, 2006);

25         (B)     "We believe these unacceptable measures were isolated instances that do not

26 reflect the broader behavior and values of HP, its employees or its board." (HP press release: "Mark

27 Hurd Named HP Chairman, In Addition to His Roles as President and CEO," Sept. 22, 2006);

28

(C)     "As many of you know, unfortunately, there has been a history of company information leaking from within the board.  This is clearly in violation of HP's Standards of Business Conduct, our ethics policy that apply to all employees and all board members." (Hurd's comments in Sept. 12, 2006 press conference);

(D)     "HP has a distinguished history of conducting business with uncompromising integrity. We believe that these were isolated instances of impropriety and not indicative of how we conduct business at HP…. Integrity is core to everything we stand for both within HP and in our dealings with customers." (Hurd's comments in Sept. 12, 2006 press conference);

(E)     "The company also appointed Bart M. Schwartz, a former U.S. prosecutor, as counsel, to perform a forward looking and independent review of investigative methods and the company's Standards of Business Conduct processes." (Hurd's comments in Sept. 12, 2006 press conference).

28.     Hurd's  testimony in front of the House Committee on Energy and Commerce on Sept. 29, 2006, similarly emphasized HP's commitment to integrity in how it conducts business and the responsibility of insiders not to betray confidential information.  Specifically, Hurd stated:

(A)     "HP is a company that has consistently earned recognition for our adherence to standards of ethics, privacy and corporate responsibility.";

(B)     "This company is built on integrity. If Bill Hewlett and David Packard were alive today, they would be appalled. They would be embarrassed. And that is the way the people at our company feel.";

(C)     "I am responsible for the company, which means I am responsible for fixing it and leading it forward through this hard time.";

(D)     "Board members have a fiduciary responsibility not to disclose internal deliberations, which can affect trust, board dynamics and effectiveness, not to mention share price and market trading."

29.     In the wake of this scandal, disclosures regarding executives and key employees took on heightened importance.  HP's 10-K filings for 2007 through 2009 included in the "Risk Factors" section the following paragraph stressing the importance of retaining key personnel.  It stated:

> In order to be successful, we must attract, retain and motivate executives and other key employees, including those in managerial, technical, sales, marketing and IT support positions. Hiring and retaining qualified executives, engineers, skilled solutions providers in the IT support business and qualified sales representatives are critical to our future, and competition for experienced employees in the IT industry can be intense. The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations.

(Emphasis added). This same paragraph was also included in all of HP's 10-Qs filed during the Class Period.

30.     In May 2008, HP released an updated version of its Standards of Business Conduct ("SBC") guide that opened with a message from Mark Hurd in which he applied the obligation to adhere to HP's ethics standards to all employees.

(A)     "Our shared values are as relevant today as they have ever been and continue to form the cornerstone of our ethical standards.";

(B)     "We must make decisions and behave in ways that we can be proud of, that reflect our commitment to doing the right thing. Every employee, along with our customers and partners, expects Hewlett-Packard to stand for integrity in everything we do.";

(C)     "Let us commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards embodied within our SBC."

31.   The SBC includes specific provisions that Hurd, himself ended up violating:

(A)     Under the header, "We make ethical decisions," the SBC instructs to "obey the law and HP policies" and "use your good judgment, the Headline Test, and the supporting decision-making model to work through situations where the right course of action isn't clear.";

(B)     Under the header, "We take action when aware of misconduct," the SBC instructs to "report any alleged misconduct immediately.";

(C)     Under the header, "We use our assets wisely," the SBC instructs: "keep personal use of HP assets to a minimum," "do not allow other people, including friends and family, to use HP resources," "avoid any use that may lead to loss and damages," and "uphold your responsibility to protect HP financial assets.";

(D)     Under the header, "We maintain accurate business records," the SBC instructs to "create business records that accurately reflect the truth of the underlying transaction or event.";

(E)     Under the header, "We avoid conflict of interest," the SBC instructs to "make decisions in the best interest of HP" and "discuss with your manager any situation that could be perceived as a potential conflict of interest.";

(F)     Under the header, "We provide and accept gifts and entertainment only when appropriate," the SBC instructs "provide and accept gifts, favors, and entertainment only if they are reasonable complements to business relationships.";

(G)     Under the header, "We protect our sensitive information," the SBC instructs to "use and disclose HP sensitive information only for valid business purposes" and "share sensitive information outside of HP only with authorized parties who have signed a confidential disclosure agreement.";

(H)     Under the header, "Shared values - Uncompromising integrity," the SBC states "We are open, honest, and direct in all our dealings.";

(I)     Under the header, "Corporate Objectives - Leadership Capability" the SBC states, "We develop leaders at all levels who achieve business results, exemplify our values, and lead us to grow and win.";

(J)     The SBC describes keys to living up to the "Building Trust" section as "Engage in open and honest communication in all your business interactions" and "Be willing to make the right decision, even if it is not the best decisions for you."   Likewise, the keys to "uncompromising integrity" are "Do the right thing, regardless of pressure" and "Protect all HP assets, remembering that our reputation is the easiest asset to lose and the most important to keep."

32.     During the Class Period HP issued updated versions of the SBC.  These updated versions included the provisions cited in the preceding paragraph. The SBC and these subsequent versions were publicly available on HP's website during the Class Period.

## V.     HURD'S UNDISCLOSED CONDUCT AND PRACTICES THAT VIOLATED HP'S STANDARDS OF BUSINESS CONDUCT

33.     Unbeknownst to plaintiff and the Class, and as disclosed in the August 6, 2010 announcements, Defendant Hurd had been knowingly violating HP's SBC in a manner that jeopardized his continued employment at the Company.  These violations were material to investors because they subjected Hurd to the risk of dismissal from HP.  Throughout the Class Period, HP's SEC filings warned of the material consequences that could arise from the departure of key personnel, while remaining silent about Hurd's conduct.  These warnings were issued in HPs Class Period 10Ks (HP's Form 10Ks for fiscal years ended October 31, 2007, October 31, 2008, and October 31, 2009) and Class Period 10Qs (HP's Form 10Qs for the quarters ended January 31, 2008, April 30, 2008, July 31, 2008, January 31, 2009, April 30, 2009, July 31, 2009, January 31, 2010 and April 30, 2010).

34.     Hurd's improper activities commenced in 2007 with HP's retention of Fisher as an independent consultant.  Jodie Fisher, the contractor at the center of the allegations against former HP CEO Mark Hurd, worked for HP from fall of 2007 to November 2009, during which time HP paid her more than $75,000 of dollars to help host executive events.  Caprice McIlvaine, Hurd's unofficial chief of staff, hired Fisher to introduce important HP customers to Hurd at hotel receptions around the world. Before Fisher began working for HP, Hurd twice interviewed her for the position - once with McIlvaine present, and a second time alone over the course of a three-hour dinner - displaying an inordinate amount of interest in a minor position on behalf of a CEO.  Fisher and Hurd met in this capacity in numerous cities around the world from fall 2007 to fall 2009, when for unclear reasons Fisher stopped contracting with HP.

35.     As HP's internal investigation of the pair's relationship later revealed, Hurd and Fisher frequently stayed in the same hotels and dined together after marketing events. On at least a half-dozen occasions, Hurd filed expense reports naming his bodyguard as his dining companion

1    when in fact he had dined with Fisher alone. And on at least two occasions, Hurd expensed meetings

2    with Fisher in cities where no events were held - such as a trip on Feb. 11, 2008, when the pair

3    stayed in a hotel near San Diego where no HP event took place. Around the same time as that trip, in

4    March 2008, Hurd allegedly revealed details to Fisher about HP's confidential negotiations with

5    EDS.

6    **A.    Hurd's Improper Conduct is Brought to the Board's Attention**

7    36.    On June 29, 2010, Fisher's attorney sent a letter to HP's board of directors containing

8    sexual harassment claims against Hurd and HP. The letter documented Fischer's claim that Hurd

9    eliminated her contracting work because she refused Hurd's sexual advances.  Further, the letter

10   alleged that Hurd improperly disclosed to Fisher in March 2008 information regarding HP's plans to

11   acquire EDS - a confidential offer that was not made public until May 2008.

12   37.    Fisher's letter prompted the board to initiate an internal investigation of Fisher's

13   allegations. The Board at this juncture failed to disclose that Hurd had be accused of wrongdoing

14   that put his continued tenure at HP in jeopardy or that the Board had initiated an investigation into

15   accusations of wrongful conduct by Hurd.

16   38.    The results of the probe, which the investigating law firm, Covington & Burling,

17   presented to the board on July 28, 2010, revealed inaccurate expense reports filed by Hurd along

18   with significant discrepancies between the probe's findings and the account Hurd initially gave to

19   directors regarding Fisher's allegations.  When the board first approached Hurd about Fisher's letter,

20   Hurd claimed he did not know Fisher well and had been entirely ignorant of her adult film work.

21   However, investigators reviewed his web history and found that he had repeatedly visited a

22   pornographic website featuring Fisher.  Hurd eventually admitted that he and Fisher had a "very

23   close personal relationship."

24   39.    Although the Covington investigators, did not find evidence supporting Fisher's

25   sexual harassment allegations or insider trading on the EDS disclosure, they did not interview Fisher

26   or her attorney.  As such, their investigation was incomplete in scope.

27

28

AMENDED COMPLAINT

40.     By July 29, 2010 the board had agreed to disclose Fisher's allegations and part of the probe, having concluded that Hurd had irreparably comprised the board's trust by misleading directors.

**HP's official announcement and accompanying explanation of Hurd's resignation**

41.     On August 6, 2010, HP announced Hurd's resignation in a press release.   HP followed the press release with a conference call that evening. The press release revealed for the first time that, despite HP's public statements about its standards of business conduct, and despite HPs warnings of the risks to the Company of key personnel departures, Hurd was engaged in knowing violation of those standards in a manner that subjected him to dismissal.   Specifically, sexual harassment claims against Hurd prompted an investigation by independent and HP counsel that uncovered conduct prompting Hurd's resignation.   (The press release also named HP CFO Cathie Lesjak as interim CEO and announced preliminary results with a raised full-year outlook.) The press release noted that the investigation uncovered "violations of HP's Standards of Business Conduct," by Hurd.

42.     Along with comments from HP Director Robert Ryan and newly appointed interim CEO Cathie Lesjak, the press release quoted Hurd saying that his misconduct necessitated his resignation as CEO: "As the investigation progressed, I realized there were instances in which I did not live up to the standards and principles of trust, respect and integrity that I have espoused at HP and which have guided me throughout my career. . . . I believe it would be difficult for me to continue as an effective leader at HP and I believe this is the only decision the board and I could make at this time."

43.     A few hours later, HP's General Counsel Mike Holston, interim CEO and CFO Lesjak, and Director Andreessen elaborated upon the reasons for Hurd's resignation in a conference call.   Holston stated that the board became aware of the accusations "several weeks ago" and immediately ordered an investigation. Holston also provided the most detailed account of the probe's findings by HP personnel in an official capacity (further information was later leaked to the press by anonymous inside sources).

44.    "The findings of the investigation were as follows," Holston said. "Mark had a close personal relationship with a HP contractor who was hired by the office of the CEO and Mark never disclosed that relationship to the Board of Directors.  The investigation revealed numerous instances where the contractor received compensation and/or expense reimbursement where there was not a legitimate business purpose.  And the investigation found numerous instances where inaccurate expense reports were submitted by Mark or on his behalf that intended to or had the effect of concealing Mark's personal relationship with the contractor."

45.    Andreessen provided a little further insight into the board's decision process and ultimate rationale.  "This is a painful decision for everyone involved, given the strong leadership Mark has provided since he joined HP five years ago. But this was a necessary decision. . . . Sadly, Mark's conduct undermined the standards we expect of our employees, not to mention the standards to which the CEO must be held, and the Board decision was unanimous."  In an attempt to lessen the fallout from Hurd's resignation, both Andreessen and Lesjak attempted to down play the loss of Hurd by emphasizing the importance of lower management - Andreessen touting HP's "broad and deep executive bench strength," and Lesjak praising "the strong management systems and the operational discipline that are now an integral part of HP's DNA."

**B.    Market reaction to Hurd's resignation**

46.    Hurd's abrupt departure shocked investors and caused HP's stock price to decrease sharply in the days and weeks that followed. Hurd had pushed HP to the top of the information technology heap through aggressive cost-cutting and restructuring that prepared HP to weather an economic downturn that hit the computer industry particularly hard.  His scandalous departure also raised eyebrows because his reputation for shrewd business savvy was nearly matched by his public emphasis on sound business ethics.  As noted in a Wall Street Journal Article published on August 9, 2010, "[t]he scandal brought to a surprising end the tenure of a CEO who has placed great emphasis on upgrading H-P's ethics standards. Mr. Hurd had pledged to make the company's code of business conduct stronger following a 2006 boardroom investigation that triggered the departure of then-HP chairwoman Patricia Dunn."

47.     HP's share price fell sharply in response to the disclosure of Hurd's resignation as a result of his violations of HP's standards of conduct.   The first day of trading after Hurd's resignation, HP's shares lost approximately 8.2% of their value, falling from $46.30 per share on August 6, 2010 to close at $42.50 per share on August 9, 2010.   HP's share price continued to fall over the next few trading days and HP's closing share price on August 13, 2010, one week after the announcement of Hurd's resignation, was $40.45 representing a 12.6% drop in value.

48.     Since Hurd's resignation, HP's stock price has continued to decline.   On August 6, 2010 before news of Hurd's resignation was made public HP's stock closed at $46.30.   One year later, the stock price had declined to $30.82, and two years later it had declined to $18.69.   At present, the stock trades at just $14.29 - - a decline of over 69% since Hurd's departure.   An article published in Business Insider (www.businessinsider.com) on April 27, 2011 and authored by Henry Blodget, attempted to assess how much Hurd's exit cost HP's shareholders.   The author concluded "So it seems safe to say that Hurd's departure from HP has cost the company's shareholders at least $10 billion and probably a lot more." Thus, Hurd's absence did in fact prove to materially impact HP's performance in a negative way.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING ADHERENCE TO ETHICAL STANDARDS

49.     Throughout the Class Period, Defendants issued statements regarding ethical standards with which its employees and officers needed to comply.   These statements were materially misleading due to their failure to disclose that a key executive, CEO Hurd, was knowingly violating these policies.

50.     Prior to and throughout the Class Period, Defendants issued additional statements regarding ethical standards with which HP employees and officers needed to comply.   HP issued a Standards of Business Conduct Brochure (SBC) in 2006, May 2008 and June 2010.   All of these versions included statements concerning, *inter alia*, HP's purported standards governing interpersonal conduct, use of company resources, and maintenance of accurate business records.

51.     Upon information and belief, as of the commencement of the Class Period the 2006 SBC was publicly available on HP's website.  In May 2008, HP published an updated version of the 2006 SBC.  The May 2008 SBC was made publicly available on the HP website upon information and belief in May 2008.  In June 2010, HP once again published an updated version of the SBC and upon information and belief the June 2010 SBC was made publicly available on the HP website in June 2010.

52.     Moreover, in the May 2008 SBC, Hurd made the following false and misleading statements: in his opening statement to the May 2008 SBC:

(A)     "Our shared values are as relevant today as they have ever been and continue to form the cornerstone of our ethical standards.";

(B)     "We must make decisions and behave in ways that we can be proud of, that reflect our commitment to doing the right thing. Every employee, along with our customers and partners, expects Hewlett-Packard to stand for integrity in everything we do.";

(C)     "Let us commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards embodied within our SBC."

53.     These statements were false and misleading in that they imply that the obligation to adhere to HP's ethics standards applies to all employees, including Hurd and that Hurd by endorsing these standards was in fact in compliance with them.

54.     The May 2008 SBC and the June 2010 SBC issued during the Class Period, featured a number of tenets that were false and misleading.  These false and misleading tenets were as follows:

(A)     Under the header, "We make ethical decisions," the SBC instructs to "obey the law and HP policies" and "use your good judgment, the Headline Test, and the supporting decision-making model to work through situations where the right course of action isn't clear.";

(B)     Under the header, "We take action when aware of misconduct," the SBC instructs to "report any alleged misconduct immediately.";

(C)     Under the header, "We use our assets wisely," the SBC instructs employees: "keep personal use of HP assets to a minimum," "do not allow other people, including friends and family, to use HP resources," "avoid any use that may lead to loss and damages," and "uphold your responsibility to protect HP financial assets.";

(D)     Under the header, "We maintain accurate business records," the SBC instructs to "create business records that accurately reflect the truth of the underlying transaction or event.";

(E)     Under the header, "We avoid conflict of interest," the SBC instructs to "make decisions in the best interest of HP" and "discuss with your manager any situation that could be perceived as a potential conflict of interest.";

(F)     Under the header, "We provide and accept gifts and entertainment only when appropriate," the SBC instructs "provide and accept gifts, favors, and entertainment only if they are reasonable complements to business relationships.";

(G)     Under the header, "We protect our sensitive information," the SBC instructs to "use and disclose HP sensitive information only for valid business purposes" and "share sensitive information outside of HP only with authorized parties who have signed a confidential disclosure agreement.";

(H)     Under the header, "Shared values - Uncompromising integrity," the SBC states "We are open, honest, and direct in all our dealings.";

(I)     Under the header, "Corporate Objectives - Leadership Capability," the SBC states, "We develop leaders at all levels who achieve business results, exemplify our values, and lead us to grow and win.";

(J)     The SBC directs that "Keys to living up to the Building Trust section" of the SBC are to "Engage in open and honest communication in all your business interactions" and "Be willing to make the right decision, even if it is not the best decisions for you.";

(K)     The SBC directs that "Keys to living up to the "Uncompromising Integrity" section of the SBC are to "Do the right thing, regardless of pressure" and "Protect all HP assets, remembering that our reputation is the easiest asset to lose and the most important to keep."

55.     Additionally, on or around November 13, 2007, HP Vice President and Chief Ethics and Compliance Officer Jon Hoak spoke about renewing HP's commitment to a culture of integrity at a meeting with members of the Business and Organizational Ethics Partnership at the Markkula Center for Applied Ethics at Santa Clara University. Hoke described HP's new vision for ethics and compliance as a competitive advantage and detailed the action items his office laid out to rebuild the company's reputation which included revising the SBC code and enhancing the HR process related to the SBC including holding employees at all levels accountable.

56.     These statements were misleading because in light of Hurd's endorsement of these tenets, there was an implication that Hurd was in fact in compliance with them.  In truth Hurd was knowingly violating each of these tenets in his dealings related to Fisher, by (a) inappropriately using his position as CEO to attempt to pursue a romantic relationship with Fisher, (b) submitting expense reports that did not accurately reflect their meetings, and (c) knowingly allowing Fischer to received compensation and/or expense reimbursement where there was not a legitimate business purpose.

## VII.   DEFENDANTS' FALSE AND MISLEADING FILINGS WITH THE SEC: IMPACT ON HP'S SUCCESS AND OPERATIONS IF HP LOSES KEY EMPLOYEES OR EXECUTIVES

57.     Defendants' knowing breaches of the aforementioned ethical tenets rendered Class Period statements made in various SEC filing which referred to the impact a loss of any key employees or executives would have on HP's success and operations, misleading.

58.     Defendants included the following paragraph in the "Risk Factors" section of the Class Period Forms 10-K and in the  "Factors That Could Affect Future Results" section of the Class Period Forms 10-Q:

> In order to be successful, we must attract, retain and motivate executives and other key employees, including those in managerial, technical, sales, marketing and IT support positions. Hiring and retaining qualified executives, engineers, skilled solutions providers in the IT support business and qualified sales representatives are critical to our future, and competition for experienced employees in the IT industry can be intense. The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations.

59. The aforementioned paragraph regarding the impact a loss of any key employees or executives would have on HP's success and operations was included in the following Forms 10K that Defendants caused HP with the SEC:

   (A) on, a Form 10-K for the fiscal year ended October 31, 2007 (the "2007 Form 10-K"), signed inter alia by Hurd;

   (B) on, a Form 10-K for the fiscal year ended October 31, 2008 (the "2008 Form 10-K"), signed inter alia by Hurd;

   (C) on, a Form 10-K for the fiscal year ended October 31, 2009 (the "2008 Form 10-K"), signed inter alia by Hurd.

(collectively, the "Class Period Forms 10-K")

60. The aforementioned paragraph regarding the impact a loss of any key employees or executives would have on HP's success and operations was included in the following Forms 10K that Defendants caused HP with the SEC:

   (A) on Form 10-Q for the quarter ended January 31, 2008 , signed inter alia by Hurd;

   (B) on Form 10-Q for the quarter ended April 30, 2008 , signed inter alia by Hurd;

   (C) on Form 10-Q for the quarter ended July 31, 2008 , signed inter alia by Hurd;

   (D) on Form 10-Q for the quarter ended January 31, 2009 , signed inter alia by Hurd;

   (E) on Form 10-Q for the quarter ended April 30, 2009 , signed inter alia by Hurd;

   (F) on Form 10-Q for the quarter ended July 31, 2009, signed inter alia by Hurd;

   (G) on Form 10-Q for the quarter ended January 31, 2010, signed inter alia by Hurd;

   (H) on Form 10-Q for the quarter ended April 30, 2010 , signed inter alia by Hurd.

(collectively, the "Class Period Forms 10-Q")

61. The aforementioned paragraph regarding the impact a loss of any key employees or executives would have on HP's success and operations included in the Class Period Forms 10-K and

1  Class Period Forms 10-Q (Collectively "Class Period Forms 10K and Forms 10Q"), constitutes a

2  disclosure concerning the risk to HP's success and operations associated with the failure to retain

3  key employees or executives.

4      62.     Such disclosures created a duty to disclose Defendants' above-mentioned,

5  undisclosed and fraudulent business practices (see section V, above).

6      63.     The omission from the Class Period Forms 10-K and Forms 10-Q that Hurd was

7  engaged in conduct that violated HP's standards and business code and generally put his continued

8  tenure as CEO of HP in jeopardy was a material omission from the Class Period Forms 10-K and

9  Forms 10-Q, and rendered them materially false and misleading.

10      64.     Additionally, the Class Period Form 10Ks and Form 10Qs reference the settlement

11  agreement between HP and the plaintiffs in the consolidated California and Delaware derivative

12  actions filed in response to the 2006 HP pre-texting scandal entered into on December 14, 2007.  In

13  these Class Period Form 10Ks and Form 10Qs, HP represents that under the terms of the settlement,

14  HP has agreed to continue to implement certain corporate governance changes until December 31,

15  2012.  As made clear in the actual Settlement Agreement that was filed in the California State Court

16  as of December 18, 2007 as well as the Notice disseminated to derivative class members on or

17  around January 11, 2008 and the Summary Notice published in *The New York Times* and *The Wall*

18  *Street Journal* on or around January 21, 2008, many of these governance changes relate to enhancing

19  HP's ethics and compliance with the SBC and enhancements to the SBC itself.

20      65.     The Class Period Forms 10-K and Forms 10-Q omitted any mention of Hurd's actual,

21  fraudulent and noncompliant business practices.  These omissions were material and rendered the

22  Class Period Forms 10-K and Forms 10-Q false, incomplete and misleading.

23  **VIII.  MATERIALITY**

24      66.     Once the truth concerning – and the consequences of – Hurd's misconduct emerged,

25  investor confidence in HP was shattered and a steep slide in the price of HP's common stock ensued.

26  The first day of trading after Hurd's resignation, HP's shares lost approximately 8.2% of their value,

27  falling from $46.30 per share on August 6, 2010 to close at $42.50 per share on August 9, 2010.

28

HP's share price continued to fall over the next few trading days and HP's closing share price on August 13, 2010, one week after the announcement of Hurd's resignation, was $40.45 representing a 12.6% drop in value. This clearly demonstrates the impact that Defendants' improper business practices and materially false and misleading public statements had on the market's assessment of the value of HP's stock.

67. This sharp and immediate market reaction is an extremely practical and clear indicator of materiality.

68. Materiality is also evidenced by Hurd's own statement that his misconduct necessitated his resignation as CEO: "As the investigation progressed, I realized there were instances in which I did not live up to the standards and principles of trust, respect and integrity that I have espoused at HP and which have guided me throughout my career . . . I believe it would be difficult for me to continue as an effective leader at HP and I believe this is the only decision the board and I could make at this time." Hurd's statement that his resignation was necessitated by the fact that his conduct compromised his ability to lead constitutes an admission that espousing standards and principles of trust, respect and integrity are integral to being an effective leader at HP and that effective leadership is in turn integral in maintaining the investment quality of HP.

69. HP's own Class Period statements also evidenced the materiality of the continued tenure of a key executive such as Hurd. HP stated in the "Risk Factors" section of the Class Period Forms 10-K and in the "Factors That Could Affect Future Results" section of the Class Period Forms 10-Q:

> In order to be successful, we must attract, retain and motivate executives and other key employees, including those in managerial, technical, sales, marketing and IT support positions. Hiring and retaining qualified executives, engineers, skilled solutions providers in the IT support business and qualified sales representatives are critical to our future, and competition for experienced employees in the IT industry can be intense. The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations.

In light of this disclosure, it is clear that HP itself thought that it was important enough to enumerate as a Risk Factor and a Factor That Could Affect Future Results the fact that the loss of a key

1 │ employee or executive could have a significant impact on HP's success and operations.

2 │ Accordingly, conduct that jeopardized Hurd's continued tenure at HP is clearly material.

3 │        70.    Further, the continued stock price decline since Hurd's resignation demonstrates that

4 │ Hurd's leadership of HP was in fact a material factor in determining HP's success.  On August 6,

5 │ 2010 before news of Hurd's resignation was made public HP's stock closed at $46.30.  One year

6 │ later, the stock price had declined to $30.82, and two years later it had declined to $18.69.  At

7 │ present, the stock trades at just $14.29 - - a decline of over 69% since Hurd's departure.  Moreover, a

8 │ financial news article published in Business Insider (www. businessinsider.com) on April 27, 2011

9 │ and authored by Henry Blodget, attempted to assess how much Hurd's exit cost HP's shareholders.

10 │ The author concluded "So it seems safe to say that Hurd's departure from HP has cost the

11 │ company's shareholders at least $10 billion and probably a lot more."  Thus, Hurd's absence did in

12 │ fact prove to materially impact HP's performance in a negative way.

13 │        71.    Moreover, the market once before had shown that Hurd's continued tenure as the

14 │ head of HP materially impacted HP's investment value.  Although there was much coverage

15 │ regarding the pre-class period pretexting scandal, HP shares remained buoyant in light of the

16 │ concurrent disclosures of HP's increase in profitability of its main business and its capture of

17 │ increased market share. Hurd is credited with implementing these strategies that resulted in HP's

18 │ turnaround.  However, when Hurd was temporarily implicated as a potential target in the pretexting

19 │ scandal, there was an immediate 5.19% drop in HP's stock price.  This was the first time HP's stock

20 │ price fell significantly since the revelations regarding the pretexting scandal began in early

21 │ September 2010.  Moreover, with respect to the pretexting scandal, an analyst from Sanford C.

22 │ Bernstein & Company commented "to the degree it impacts the C.E.O., that is something we are

23 │ nervous about."  Thus pretexting scandal demonstrated that the quality, legitimacy, integrity and

24 │ continuation of Hurd's management and business practices were central factors in assessing HP's

25 │ investment value.

26

27

28

## IX. LOSS CAUSATION

72.     Defendants' above-mentioned, undisclosed and fraudulent business practices allowed HP to report misleading, false and inflated financial revenues, income, profits, margins and growth. Defendants omitted to disclose that Hurd was engaged in illegitimate and unethical practices that put his continued tenure as CEO in jeopardy thereby threatening the stability of the leadership structure at HP, and in turn undermining HP's ability to build upon prior success and meet earnings estimates. Believing that HP was a well-managed, well-run company due in part to the executive leadership of Hurd and that the continued leadership of HP by Hurd was not in jeopardy, the market consequently so valued HP's shares.  Defendants' false and misleading statements caused HP stock to trade at artificially inflated levels throughout the Class Period.

73.     Although the market and the investing public did not then know it, HP was not as it seemed.  Hurd's continued leadership, which largely drove the revenues, profits, income and margins, and the growth in the foregoing that formed the basis for the market's valuation of HP's stock value, was not actually secure.  Hurd's unethical and illegitimate business practices which violated HP's Standards of Business Conduct and arguably violated HP's Sexual Harassment Policy, disqualified Hurd from continuing as CEO of HP.  The loss of Hurd's leadership significantly devalued HP's value and its potential for success in such a challenging economic environment.

74.     HP's share price fell sharply in response to the disclosure of Hurd's resignation and the consequent market revision of HP's future.  The first day of trading after Hurd's resignation, HP's shares lost approximately 8.2% of their value, falling from $46.30 per share on August 6, 2010 to close at $42.50 per share on August 9, 2010.  HP's share price continued to fall over the next few trading days and HP's closing share price on August 13, 2010, one week after the announcement of Hurd's resignation, was $40.45 representing a 12.6% drop in value.

75.     In sum, during the Class Period, by failing to disclose that Hurd's financial performance was the result of improper, illegitimate and illegal business practices, Defendants engaged in a course of conduct that deceived the market, that artificially inflated the prices of HP's shares, and that operated as a fraud and deceit upon plaintiff and the Class.  Defendants' failure to disclose their above-mentioned, undisclosed and fraudulent business practices misled plaintiff and

the Class as to HP's future prospects. As a result of Hurd's undisclosed, fraudulent business practices, investors did not know that there was a significant risk Hurd - who had implemented strategies that were integral in allowing HP to weather the challenging economic environment better than its competitors - would no longer continue as HP's CEO. Therefore, by concealing rather than disclosing such risks (and the conduct, which gave rise to those risks), Defendants presented to plaintiff and the Class a misleading picture of HP's prospects for building upon prior success and meeting earnings estimates. The August 2010 disclosure had a substantial and material corrective effect on the value of and artificial inflation in HP's shares, causing plaintiff and other Class Members economic losses and thus damages under the federal securities laws.

76.     The more than 12% decline in the value of HP's shares following the above-detailed disclosures was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing, speed and magnitude of HP's price declines negate any inference that the losses suffered by plaintiff and the Class were caused by changed market conditions, macroeconomic or industry-wide factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic losses suffered by plaintiff and the Class were the direct result of Defendants' artificial inflation of HP's share price and the subsequent decline in the value of HP's shares when Defendants' Class-Period misrepresentations and other fraudulent conduct were revealed.

## X. DEFENDANTS' MISREPRESENTATIONS PROXIMATELY CAUSED PLAINTIFF'S DAMAGES THROUGH A FRAUD ON THE MARKET

77.     At all relevant times, the market for HP's stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in HP's stock price.

78.     The common stock of HP met the requirements for listing, and was listed and actively traded, on the NYSE, a highly developed and efficient market. During the Class Period, HP stock was heavily traded, with volume averaging millions of shares daily. HP filed periodic public reports with the SEC, and was followed by dozens of analysts from brokerages including: Argus Research

Corp., Atlantic Equities, Auriga USA, Bank of America - Merrill Lynch, Barclays Capital, Battle Road Research, BMO, Brean Murray, Carret & Co., Caris & Co., Citigroup, Cleveland Research Company, Collins Stewart LLC, Credit Agricole Securities, Credit Suisse, Cross Research, Crowell, Weedon & Co., Deutsche Bank North America, Dolmen Securities, First Global Stockbroking Ltd., Gleacher & Co., Goldman Sachs & Co., Hamburger Sparkasse (Hasp), IS Group, J.P. Morgan, JMP Securities, Jyske Bank, Kaufman Brothers, Morgan Stanley, Morningstar, Inc., Needham & Company, Nutmeg Securities, Pacific Crest Securities, Raymond James & Associates, RBC Capital Markets, Robert W. Baird & Co., Inc., Sanford C. Bernstein & Co., LLC, Sterne, Agee & Leach, Stifel Nicolaus & Company, Susquehanna Financial Group, Technology Insights Research, Technology Research Group, Ticonderoga Securities, UBS, Wall Street Strategies, Wells Fargo Securities. The reports of these analysts were redistributed to their customers and the public at large, and HP regularly issued press releases, which were carried by national newswires. Thus, the analyst reports and HP's press releases entered the public marketplace. As a result, the market for HP's stock promptly digested current information with respect to HP from all publicly-available sources, and reflected such information in HP's stock price. Plaintiff and other members of the Class relied on the integrity of the market price of HP's publicly traded stock.

79.     As would be expected where a security is traded in an efficient market, material news concerning HP's operations, financial results, and prospects had an immediate effect on the market price of HP stock. Disclosure of the Board's investigation and Hurd's resignation on August 6, 2010 and the consequent drop in the value of HP's common stock, vividly so demonstrate.

80.     At the times plaintiff purchased or otherwise acquired the Company's stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## XI.     SCIENTER ALLEGATIONS

81.     As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading, knew that such statements and documents

would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants either knew or recklessly disregarded the fact that the improper and unethical acts and practices and misleading statements and omissions described herein would artificially inflate or maintain the price of HP's stock. Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and members of the Class that plaintiff seeks to represent.

82.     Because of Hurd's position of control and authority as an officer and director of the Company, he was able to, and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to HP. Hurd was provided with copies of HP's press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of Hurd's board membership and executive and managerial positions with HP, he knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Hurd is therefore liable for the false statements pleaded herein.

83.     Specifically, Hurd was aware: (a) of the existence and nature of the policies set forth in the SCB; (b) of his own inappropriate relationship with Fisher; (c) that his own expense reports were inaccurate; (d) that his conduct with respect to his expense reports and the nature of his dealings with Fisher rendered the public statements about the SCB misleading; (e) that Class Period annual and quarterly financial statements included statements indicating the importance of retaining key employees to HP's success; and (f) that his conduct jeopardized his continued tenure at HP and thereby rendered statements in the financial statements about the importance of retaining key employees misleading. This knowledge supports an inference of scienter.

84.     An inference of scienter is further supported by Hurd's conduct after Fisher's counsel sent the June letter. When first questioned about his relationship with Hurd during the internal investigation, Hurd inaccurately described the frequency and nature of his relationship and dealings

1    with Fisher and falsely denied knowledge of Fisher's adult film work during the Board's internal

2    investigation in July 2010. As the investigation continued Hurd later admitted that he had pursued a

3    close personal relationship with Fisher and had repeatedly visited a pornographic website in which

4    Fisher was featured. In light of Hurd's attempt to hide his actual dealings and activities related to

5    Fisher, the logical inference is that Hurd always knew these dealings and activities violated tenets set

6    forth in the SBC and jeopardized his continued tenure as CEO.

7          85.      An inference of scienter is also supported by the private settlement between Hurd and

8    Fisher and Hurd's subsequent resignation. In the course of the Board's internal investigation into

9    Hurd and Fisher's relationship, Fisher was not interviewed. By July 29, 2010, the Board had

10    decided to disclose Fisher's allegations against Hurd. At this time, Hurd was aware that the internal

11    investigation had not shown evidence of insider trading on EDS disclosure or of sexual harassment

12    of Fisher. Mediation was scheduled in the first week of August 2010, in which the Board was to

13    question both Hurd and Fisher about the EDS disclosure and to hold a final vote on Hurd's future at

14    HP. By August 3, 2010, Hurd learned that the Board wanted to terminate him immediately. The

15    next day Hurd reached a private settlement with Fisher in which Hurd paid Fisher an undisclosed

16    sum and Fisher issued a letter absolving HP of responsibility and the vague admission that her letter

17    to the Board dated June 29, 2010, contained many inaccuracies. This private settlement rendered the

18    private mediation unnecessary. The most plausible inference as to why Hurd would enter into a

19    settlement was that Hurd always knew his dealings and activities were improper, violated tenets set

20    forth in the SBC and jeopardized his continued tenure as CEO and that if he silenced and placated

21    Fisher, Hurd thought he might still be able to salvage his job as HP's CEO despite his improper

22    conduct.

23          86.      An inference of scienter is further supported by the Hurd's continued attempts to keep

24    Fisher's June 2010 letter to the Board confidential even after he resigned. In a related derivative

25    action, *Espinoza v. Hewlett-Packard*, CA 600 (Del. Ch., filed November 18, 2010), Hurd appealed

26    an order compelling the produce Fisher's June 2010 letter to the Board. The logical inference from

27    Hurd's attempt to suppress this letter is that it contained additional information regarding Hurd's

28

1  unethical and improper Class Period conduct.  In light of Hurd's attempt to hide his actual dealings

2  and activities related to Fisher, the logical inference is that Hurd always knew these dealings and

3  activities were improper, violated tenets set forth in the SBC and jeopardized his continued tenure as

4  CEO.

5      87.   Moreover the Board Defendants also acted with scienter.  For a period of more than

6  one month, Board Defendants were aware of the detailed accusations of Hurd's misconduct and that

7  a formal investigation into such conduct had been commenced.  Moreover, the Board Defendants

8  knew that Hurd's alleged conduct if true would render statements that implied Hurd's compliance

9  with the SCB false and misleading.  Further, the Board Defendants knew that Hurd's alleged

10  conduct, if true, jeopardized Hurd's continued tenure at HP and thereby rendered statements in the

11  financial statements about the importance of retaining key employees misleading.

12  **XII.   CLASS ACTION ALLEGATIONS**

13      88.   Plaintiff brings this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of

14  Civil Procedure, on behalf of themselves and on behalf of a class of persons and entities that

15  purchased HP stock from November 13, 2007 through August 6, 2010, inclusive and who still held

16  the shares at the close of trading on August 6, 2010 (the "Class").  Excluded from the Class are

17  Defendants herein, members of the immediate families of each of the Defendants, any person, firm,

18  trust, corporation, officer, director or other individual or entity in which any Defendant has a

19  controlling interest or which is related to or affiliated with any of the Defendants, and the legal

20  representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

21      89.   This action is properly maintainable as a class action for the following reasons:

22          (A)   The Class is so numerous that joinder of all Class members is impracticable.

23  HP has more than 1.9 billion shares outstanding, and an average of more than 20 million HP shares

24  traded per day during the Class Period. Members of the Class are scattered throughout the United

25  States.

26

27

28

(B)     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual Class members. These common questions include, inter alia:

(i)     Whether the Defendants' acts as alleged herein violated the federal securities laws;

(ii)    Whether Defendants participated in and pursued the common course of conduct complained of herein;

(iii)   Whether documents, SEC filings, press releases and other statements disseminated to the investing public and HP's common stockholders during the Class Period misrepresented material facts about HP and its executives;

(iv)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of circumstances under which they were made, not misleading;

(v)     Whether Defendants knew or deliberately disregarded that their statements were false or misleading;

(vi)    Whether the market prices of HP stock during the Class Period  were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(vii)   To what extent the members of the Class have sustained damages and the proper measure of damages.

(C)     Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff and the Class sustained damages from Defendants' wrongful conduct, which caused all HP shares to trade at artificially inflated prices throughout the Class Period.

(D)     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff has no interests that are adverse or antagonistic to the interests of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

AMENDED COMPLAINT

(E)     Plaintiff anticipates that there will not be any difficulty in the management of this litigation as a class action.

90.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size of the individual Class members' claims, few, if any Class members could afford to seek legal redress individually for the wrongs complained of herein.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

91.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

92.     This Count is brought by plaintiff pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

93.     The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of HP stock in an effort to maintain artificially high market prices for HP stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

94.     In addition to the duties of full disclosure imposed on the Defendants by their status as controlling persons of HP, as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, and as a result of their sales of HP stock during the Class Period, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17

1    C.F.R. §229.10, et seq.) and other SEC regulations, including accurate and truthful information with

2    respect to HP's stock, operations, financial condition and earnings so that the market price of HP

3    stock would be based on truthful, complete and accurate information.

4        95.    Defendants, by using the means and instrumentalities of interstate commerce and/or

5    of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

6    information about the business and operations of HP as specified herein. The Defendants employed

7    devices, schemes and artifices to defraud, while in possession of material adverse non-public

8    information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to

9    assure investors of HP's value, which included the making of, or the participation in the making of,

10   untrue statements of material facts and omitting to state material facts necessary in order to make the

11   statements made about HP, in light of the circumstances under which they were made, not

12   misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

13   of business which operated as a fraud and deceit upon the purchasers of HP stock during the Class

14   Period.

15       96.    The Defendants had actual knowledge of the misrepresentations and omissions of

16   material facts set forth herein or recklessly disregarded the same. Defendants' material

17   misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect of

18   concealing Hurd's unethical and improper conduct, the fact that this conduct put Hurd's continued

19   ability to continue to serve as HP's CEO in jeopardy.

20       97.    As a result of the dissemination of the materially false and misleading information

21   and failure to disclose material facts by Defendants, as set forth above, the market price of HP stock

22   was artificially inflated during the Class Period. In ignorance of the fact that the market price for HP

23   stock was artificially inflated, and relying directly or indirectly on the false and misleading

24   statements made by Defendants, or upon the integrity of the market in which the shares trade, and

25   the truth of any representations made to appropriate agencies and to the investing public, at the times

26   at which any statements were made, and/or on the absence of material  adverse information that was

27   known by Defendants but not disclosed in public statements by Defendants during the Class Period,

28

1  plaintiff and the other members of the Class acquired HP stock during the Class Period at artificially

2  high prices and were damaged thereby as the market price of HP stock declined in response to

3  disclosures of HP's true state of affairs.

4       98.    At the time of said misrepresentations and omissions, plaintiff and other members of

5  the Class were ignorant of their falsity and believed them to be true. Had plaintiff and the other

6  members of the Class and the marketplace known of Defendants' practices and of the liabilities to

7  which such practices exposed HP and HP investors, which were not disclosed by Defendants,

8  plaintiff and other members of the Class would not have purchased HP stock during the Class

9  Period, or, if they had purchased such stock during the Class Period, they would not have done so at

10  the artificially inflated prices which they paid.

11      99.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and

12  Rule 10b-5 promulgated thereunder.

13      100.   Plaintiff and the other members of the Class suffered damages in connection with

14  their purchases of HP stock during the Class Period, a direct and proximate result of the wrongful

15  conduct of the Defendants.

16                                    **COUNT II**

17       **For Violation of Section 20(a) of the Exchange Act Against Mark Hurd**

18      101.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully

19  herein.

20      102.   Hurd acted as a controlling person of HP within the meaning of §20(a) of the

21  Exchange Act as alleged herein. By virtue of his high-level positions, participation in and/or

22  awareness of HP operations and/or intimate knowledge of its business practices, Hurd had the power

23  to influence and control and did influence and control, directly or indirectly, the decision-making of

24  HP, including the content and dissemination of the various statements which plaintiff contends are

25  false and misleading.  Hurd was provided with or had unlimited access to copies of HP's internal

26  reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior

27  to and/or shortly after these statements were issued and had the ability to either prevent the issuance

28

32
AMENDED COMPLAINT

1   of the statements or cause the statements to be corrected. In particular, Hurd had direct involvement

2   in or intimate knowledge of the day-to-day operations of HP and therefore is presumed to have had

3   the power to control or influence the particular transactions giving rise to the securities violations as

4   alleged herein, and exercised the same.

5   103.   Hurd acted as a controlling person of HP within the meaning of §20(a) of the

6   Exchange Act as alleged herein. By virtue of Hurd's high-level position, participation in and/or

7   awareness of HP operations and/or intimate knowledge of its business practices, he had the power to

8   influence and control and did influence and control, directly or indirectly, the decision-making of

9   HP, including the content and dissemination of the various statements which plaintiff contends are

10   false and misleading.  Hurd was provided with or had unlimited access to copies of statements

11   alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and

12   had the ability to either prevent the issuance of the statements or cause the statements to be

13   corrected. In particular, Hurd had direct involvement in or intimate knowledge of the day-to-day

14   operations, of HP and he obviously had knowledge of his own conduct, and therefore is presumed to

15   have had the power to control or influence the particular transactions giving rise to the securities

16   violations as alleged herein, and exercised the same.

17   104.   As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5

18   by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling

19   person, Hurd is liable pursuant to §20(a) of the Exchange Act.

20   105.   Plaintiff and other members of the Class suffered damages in connection with their

21   purchases of HP stock during the Class Period, as a direct and proximate result of the wrongful

22   conduct of Hurd.

23   **XIV.   PRAYER FOR RELIEF**

24   WHEREFORE, plaintiff, on behalf of themselves and the Class, pray for judgment as

25   follows:

26   (A)   Declaring this action to be a class action properly maintained pursuant to Rule

27   23 of the Federal Rules of Civil Procedure;

28

1          (B)     Awarding plaintiff and other members of the Class damages together with

2 interest thereon;

3          (C)     Awarding plaintiff and other members of the Class costs and expenses of this

4 litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs

5 and disbursements; and

6          (D)     Awarding plaintiff and other members of the Class such equitable/injunctive

7 and/or other and further relief as may be just and proper under the circumstances.

8 **XV.    JURY DEMAND**

9          Plaintiff demands a trial by jury.

10

11 DATED:        December 24, 2012          Respectfully submitted,

12

13                                         By: _____/s_____
                                           Ira M. Press (*pro hac vice*)
14                                         David Bishop
                                           Sarah G. Lopez (*pro hac vice*)
15                                         KIRBY McINERNEY LLP
                                           825 Third Avenue, 16th Floor
16                                         New York, NY  10022
                                           Telephone:  (212) 371-6600
17                                         Facsimile: (212) 751-2540

18                                         *Plaintiff's Counsel and Lead Counsel for Lead Plaintiff*

19                                         GLANCY BINKOW & GOLDBERG LLP
                                           Lionel Z. Glancy
20                                         Robert V. Prongay
                                           1925 Century Park East, Suite 2100
21                                         Los Angeles, California 90067
                                           Telephone:  (310) 201-9150
22                                         Facsimile:  (310) 201-9160
                                           Email:  info@glancylaw.com
23
                                           *Plaintiff's Counsel and Liaison Counsel for Plaintiff*
24

25

26

27

28

AMENDED COMPLAINT

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned say:

I am a citizen of the United States and am admitted *pro hac vice* to this Court. I am over the age of 18 and not a party to the within action. My business address is 825 Third Avenue, New York, New York 10022

On December 24, 2012, I caused to be served the following documents:

**AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

By posting the documents to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as reflected on the attached Court's Service List.

And on any non-ECF registered party:

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 24, 2012, at New York, New York.

s/ Sarah G. Lopez
Sarah G. Lopez

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

**Lionel Z. Glancy**
info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

**Sarah G. Lopez**
slopez@kmllp.com

**Ira M. Press**
ipress@kmllp.com,plinden@kmllp.com,lmorris@kmllp.com,slopez@kmllp.com

**Robert Vincent Prongay**
rprongay@glancylaw.com,mmgoldberg@glancylaw.com

**Andrew Michael Purdy**
apurdy@morganlewis.com

**Diane Leslie Webb**
dwebb@morganlewis.com,cericson@morganlewis.com

**Marc J. Sonnenfeld**
msonnenfeld@morganlewis.com

**Karen A. Pieslak Pohlmann**
kpohlmann@morganlewis.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Lawrence D. Lewis, Esq.
Allen Matkins Leck Gamble Mallory & Natsis LLP
1900 Main Street, Fifth Floor
Irvine, CA 92614

AMENDED COMPLAINT