1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   CEMENT & CONCRETE WORKERS
    DISTRICT COUNCIL PENSION FUND, et        Case No.  12-cv-04115-JST
    al.,
8
                      Plaintiffs,            **ORDER GRANTING MOTIONS TO**
9                                            **DISMISS**
          v.
10
11  HEWLETT PACKARD COMPANY, et al.,

                      Defendants.
12

13         In this securities fraud suit, Defendants Hewlett Packard Co. and its former CEO, Mark

14  Hurd, move to dismiss for failure to state a claim pursuant to the Private Securities Litigation

15  Reform Act of 1995, 15 U.S.C. § 78u–4.  Because the First Amended Complaint fails to satisfy

16  the materiality and falsity requirements for a securities fraud claim, the Court will grant the

17  motions with leave to amend.

18  **I.    FACTUAL ALLEGATIONS**

19         Lead Plaintiff Cement & Concrete Workers District Council Pension Fund's operative

20  First Amended Complaint, ECF No. 33 ("FAC"), filed on behalf of a class of purchasers of

21  Defendant Hewlett Packard Co.'s stock who purchased between November 13, 2007, and August

22  6, 2010, and held the shares as of August 6, 2010, alleges that HP and its former Chairman,

23  President, and CEO Mark Hurd committed securities fraud in violation of sections 110(b) and

24  20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5

25  promulgated thereunder by the Securities Exchange Commission (17 C.F.R. 240.10b-5).

26  **A.    The 2006 Scandal**

27         The FAC alleges that HP was embroiled in an ethics scandal in 2006 arising out of

28  information leaks that implicated several HP executives and members of its board of directors.

United States District Court
Northern District of California

FAC ¶ 3–4.  HP's then-Chairman and General Counsel were both prosecuted for their role in the scandal.  Id. ¶ 22.  Defendant Mark Hurd had become CEO in 2005 and was not implicated; instead, "he emerged with his reputation for integrity not only intact, but made all the stronger for it."  Id. ¶ 22.  HP's shares "remained buoyant" during the scandal because of the concurrent increase in the profitability of its main business and increased market share.  Id. ¶ 23.  At that time, Wall Street generally approved of CEO Hurd's efforts "to reshape the management team, improve morale and cut costs," as well as his implementation of strategies that resulted in HP's increase in market share.  Id.  However, when Hurd was implicated on September 21, 2010, as a potential target in the 2006 scandal, HP's stock price dropped 5.19 percent.  Id. ¶ 24.  The Complaint alleges that Hurd's reputation for integrity was a material factor in HP's success following the scandal.  Id. 23–25.  Hurd testified before Congress, issued press releases, briefed investors, and sent public letters to HP employees in an effort to restore public trust.  Id. ¶ 23–28.

### B.      Hurd's Departure

 HP retained Jodie Fisher as an independent consultant in the fall of 2007 to help host executive events and introduce Hurd to important HP customers at hotel receptions around the world.  Id. ¶ 34.  Fisher's contract was terminated in November 2009.  Id.  On June 29, 2010, Fisher's attorney sent HP a letter containing allegations that Hurd had sexually harassed Fisher and that her contract was terminated because she refused his sexual advances.  Id. ¶ 36.  The letter also alleged that in March 2008, Hurd disclosed to Fisher HP's plans to acquire Electronic Data Systems ("EDS") at a time that the information was confidential.  Id.  HP's Board of Directors immediately initiated an internal investigation into the allegations.  Its results were presented to the board on July 28, 2010.  Id. ¶ 38.  The investigation revealed that Hurd had filed inaccurate expense reports, and that there were factual inaccuracies in the account Hurd initially gave to directors regarding the allegations.  Id.  Hurd initially claimed not to know Fisher well and to be ignorant of her pornographic career.  An investigation revealed, however, both that Hurd was aware her prior career and that, as he eventually admitted, he and Fisher had a "very close personal relationship."  Id.

 The investigation did not reveal evidence supporting Fisher's allegations concerning

2

1    sexual harassment or insider trading with respect to the EDS acquisition; however, the

2    investigators did not interview Fisher or her attorney.  Id. ¶ 39.  On July 29, 2010, the board

3    agreed to disclose Fisher's allegations to the public as well as part of the investigation's results,

4    "having concluded that Hurd had irreparably comprised [sic] the board's trust by misleading

5    directors."  Id. ¶ 40.  HP announced Hurd's resignation on August 6, 2010.  The press release

6    included a statement from Hurd in which he stated: "I realized there were instances in which I did

7    not live up to the standards and principles of trust, respect and integrity that I have espoused at HP

8    and which have guided me throughout my career . . . ."  Id. ¶ 42.  At that time, HP's general

9    counsel revealed some of the investigation's findings, including that Hurd hired Fisher without

10   disclosing their personal relationship to the Board, that there were numerous instances in which

11   Fisher received compensation or expense reimbursement where there was not a legitimate business

12   purpose, and that Hurd submitted numerous inaccurate expense reports that were intended to or

13   had the effect of concealing his relationship with Fisher.  Id. ¶ 44.

14         Wall Street and the press reacted strongly to Hurd's departure.  One Wall Street Journal

15   Article stated: "'The scandal brought to a surprising end the tenure of a CEO who has placed great

16   emphasis on upgrading H-P's ethics standards.  Mr. Hurd had pledged to make the company's

17   code of business conduct stronger following a 2006 boardroom investigation that triggered the

18   departure of then-HP chairwoman Patricia Dunn.'"  Id. ¶ 46.  HP's share price fell 8.2% on the

19   first trading day after the announcement, and one week later had dropped 12.6%.  The day of the

20   announcement, HP's stock was trading at approximately $46.  As of the filing of the First

21   Amended Complaint, it traded at approximately $14, a 69% decline.  Id. ¶ 48.  An April 27, 2011

22   article concluded: "'it seems safe to say that Hurd's departure from HP has cost the company's

23   shareholders at least $10 billion and probably a lot more.'"  Id. (quoting Blodget, Henry,

24   businessinsider.com (April 27, 2011)).

25         **C.   Alleged Securities Fraud**

26         The FAC alleges that HP and Hurd made false and misleading statements when they

27   (1) issued and updated HP's Standards of Business Conduct Brochure (SBC) in 2006, May 2008,

28   and June 2010, and (2) approved and issued SEC Forms 10-K and 10-Q throughout the class

United States District Court
Northern District of California

1   period that contained a "Risk Factors" section stating the risk of losing key personnel.

2        The FAC does not contain any detailed allegations regarding the 2006 SBC.  Plaintiff

3   alleges that in May 2008, Hurd and HP amended the SBC to restore confidence following the

4   2006 scandal.  In the 2008 SBC, Hurd issued an opening statement in which he expressed his

5   commitment "to build trust in everything we do by living our values and conducting business

6   consistent with the high ethical standards embodied within our SBC."  Id. ¶ 52.  The 2008 and

7   2010 SBCs outlined a number of ethical rules that Plaintiff alleges Hurd violated through his

8   relationship with Fisher.  Id. ¶ 53.  Some of the ethical guidelines are specific; others, more

9   general and aspirational.  For example, the SBC provides both that "We are open, honest, and

10  direct in all our dealings," and that "We maintain accurate business records . . . that accurately

11  reflect the truth of the underlying transaction or event."  Id.  It is clear from the allegations of the

12  FAC that the SBC is directed primarily at HP's employees, though the FAC alleges that the

13  intended audience of the 2008 and 2010 SBC amendments also included Wall Street and HP's

14  shareholders and potential investors.

15       As to the SBCs, Plaintiff alleges: "These statements were misleading because in light of

16  Hurd's endorsement of these tenets, there was an implication that Hurd was in fact in compliance

17  with them.  In truth, Hurd was knowingly violating each of these tenets in his dealings related to

18  Fisher, by (a) inappropriately using his position as CEO to attempt to pursue a romantic

19  relationship with Fisher, (b) submitting expense reports that did not accurately reflect their

20  meetings, and (c) knowingly allowing Fischer to receive compensation and/or expense

21  reimbursement where there was not a legitimate business purpose."  Id. ¶ 56.

22       Plaintiff also alleges that the following passage, included in the "Risk Factors" section of

23  HP's class period Form 10-Ks and the "Factors that Could Affect Results" section of HP's class

24  period Form 10-Qs, which was added to each form following the 2006 scandal, was false and

25  misleading:

26          In order to be successful, we must attract, retain and motivate executives and other
27          key employees, including those in managerial, technical, sales, marketing and IT
        support positions.  Hiring and retaining qualified executives, engineers, skilled
28          solutions providers in the IT support business and qualified sales representatives

United States District Court
Northern District of California

are critical to our future, and competition for experienced employees in the IT industry can be intense.  The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations.

Id. ¶ 58.  Plaintiff alleges that the passage "constitutes a disclosure concerning the risk to HP's success and operations associated with the failure to retain key employees or executives."  Id. ¶ 61.  Plaintiff asserts that such disclosures "created a duty to disclose" Hurd's "above-mentioned undisclosed and fraudulent business practices."  Id. ¶ 63.  Plaintiff asserts that the Forms' omission of "any mention of Hurd's actual, fraudulent and noncompliant business practices" were material and rendered the forms "incomplete and misleading."  Id. ¶ 65.

## II.   REQUESTS FOR JUDICIAL NOTICE

"[A] district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  However, courts may properly take judicial notice of material attached to the complaint.  See Lee v. City of Los Angeles, 250 F.3d 668, 688–69 (9th Cir. 2001); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), rev'd on other grounds by Galbraith v. Cnty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002). If the documents are not attached to the complaint, they may be considered if their authenticity is not contested and the complaint "necessarily relies on them."  Lee, 250 F.3d at 688.  This has become known as the "incorporation by reference" doctrine.  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

In addition, a Court may take judicial notice of matters in the public record.  Federal Rule of Evidence 201(b) provides: a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  In contrast, a fact "subject to reasonable dispute" may not be considered.  Lee, 250 F.3d at 689 (quoting Fed. R. Evid. 201(b)).

1      At the motion to dismiss stage, "'[t]he court has complete discretion to determine whether

2 or not to accept any material beyond the pleadings that is offered in conjunction with a Rule

3 12(b)(6) motion.'"  Nat'l Agr. Chemicals Ass'n v. Rominger, 500 F. Supp. 465, 472 (E.D. Cal.

4 1980) (quoting 5 Wright & Miller, Federal Practice & Procedure, § 678 (1969)).

5      The parties have each made requests for incorporation by reference or judicial notice.

6 HP's request for incorporation by reference of HP's SBC as it existed in March 2010, ECF

7 No. 56-1, is GRANTED, because it relates directly to a central allegation in Plaintiff's complaint.

8 The remainder of the documents submitted by the parties are irrelevant and their competing

9 requests are DENIED.

10 **III.    LEGAL STANDARDS**

11      On a motion to dismiss, courts accept the material facts alleged in the complaint, together

12 with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729,

13 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true

14 is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory

15 statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of

16 truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair

17 notice and to enable the opposing party to defend itself effectively."  Starr v. Baca, 652 F.3d 1202,

18 1216 (9th Cir. 2011), cert. den'd, --- U.S. ----, 132 S.Ct. 2101 (2012).

19      In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a

20 claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

21 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a

22 defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the

23 plaintiff pleads factual content that allows the court to draw the reasonable inference that the

24 defendant is liable for the misconduct alleged."  Id.  In the Ninth Circuit, "[i]f there are two

25 alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of

26 which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).

27 Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is

28 so convincing that plaintiff's explanation is implausible."  Starr, 652 F.3d at 1216 (original

United States District Court
Northern District of California

6

1  emphasis).

2      Securities fraud plaintiffs must satisfy both Rule 9(b) and the requirements of the Private

3  Securities Litigation Reform Act of 1995 ("PSLRA").  In re VeriFone Holdings, Inc. Sec. Litig.,

4  704 F.3d 694, 701 (9th Cir. 2012).  The PSLRA establishes uniform and stringent pleading

5  requirements for securities fraud actions, and was designed to end the practice of pleading "fraud

6  by hindsight."  See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 958 (9th Cir. 1999).  A

7  securities fraud plaintiff must plead both falsity and scienter with particularity.  See Zucco

8  Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).  If the complaint does not

9  satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the

10  complaint.  15 U.S.C. § 78u–4(b)(3)(A).

11  **IV.    ANALYSIS**

12      Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission

13  resulting in fraud or deceit in connection with the purchase or sale of any security.  To state a

14  claim for violation of section 10(b), a plaintiff must plead: (1) a material misrepresentation or

15  omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or

16  omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

17  causation.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

18      HP moves to dismiss the FAC on the grounds that the SBC and the risk factors section of

19  HP's Forms 10-K and 10-Q are not actionable because they are not material.  HP also argues that

20  dismissal is necessary because Plaintiff has failed to plead falsity and scienter.  Hurd moves to

21  dismiss on the grounds that Plaintiff fails adequately to plead scienter and loss causation.

22  **A.    Materiality**

23      For statements to be actionable under the PSLRA, they must be both misleading and

24  material.  A statement or omission is misleading under the PSLRA and section 10(b) of the

25  Exchange Act "if it would give a reasonable investor the 'impression of a state of affairs that

26  differs in a material way from the one that actually exists.'"  Berson v. Applied Signal Tech., Inc.,

27  527 F.3d 982, 985 (9th Cir. 2008) (citation omitted).  That statement or omission is material if

28  there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by

United States District Court
Northern District of California

7

the reasonable investor as having significantly altered the 'total mix' of information made available." <u>TSC Indus., Inc. v. Northway, Inc.</u>, 425 U.S. 438, 449 (1976).  There arises a rebuttable presumption of reliance either where there is an omission of material fact by one with a duty to disclose, or where the challenged statements become public because public information is assumed to be reflected in the market price of the security.  <u>Stoneridge</u>, 552 U.S. at 159.

Not all alleged failures to disclose are actionable under section 10(b) or rule 10b-5.  Absent "manipulation" or "deception," that section and rule do not reach breaches of fiduciary duty, which are actionable only under state law.  <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 473–74 (1977); <u>Vaughn v. Teledyne, Inc.</u>, 628 F.2d 1214, 1222 (9th Cir. 1980) (citing <u>Santa Fe</u>).  Consequently, securities plaintiffs cannot "bootstrap" a breach of fiduciary duty claim into a federal securities fraud claim "by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives."  <u>Panter v. Marshall Field & Co.</u>, 646 F.2d 271, 288 (7th Cir. 1981).  <u>See also</u> <u>Biesenbach v. Guenther</u>, 588 F.2d 400, 402 (3d Cir. 1978) (quoting <u>Lavin v. Data Systems Analysts, Inc.</u>, 443 F. Supp. 104 (E.D. Penn. 1977) ("The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external").

HP argues that Defendants' alleged conduct did not include "actionable omissions" within the meaning of the Exchange Act, even if it could have given rise to state corporate law remedies.  The Court agrees.

### 1. The SBCs are Inactionable Puffery

Plaintiff first alleges that the 2008 and 2010 SBCs gave rise to a duty that Hurd disclose any conduct that violated the SBCs.  Plaintiff argues that Hurd's simultaneous promulgation and violation of the SBCs constituted a material omission within the meaning of the securities laws.

Generally speaking, the 2008 and 2010 SBCs, as well as other statements relating to HP's ethical code of conduct, do not constitute actionable misrepresentations or omissions because they are not material.  "'[V]ague, generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal

8

securities laws. In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quoting Glen Holly Entertainment, Inc. v. Tektronix. Inc., 352 F.3d 367, 379 (9th Cir. 2003) (discussing common law fraud)). Such statements include those that are not "'capable of objective verification'" or "'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'" Id. (quoting Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010). Instead, "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." Id. This doctrine dovetails with the Exchange Act's "safe harbor" provision for forward-looking financial statements (though here there are no financial statements at issue). 15 U.S.C. § 78u-5(c)(1).

For example, in Desai v. Gen. Growth Properties, Inc., 654 F. Supp. 2d 836, 857 (N.D. Ill. 2009), the plaintiffs argued that the defendant's publication of its code of ethics constituted a material omission by executives who were, at the same time, violating the code. The court dismissed the claim as predicated on puffery, based on the District of Colorado's decision in Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F.Supp.2d 662, 685–86 (D. Colo. 2007). In Andropolis, the court dismissed a securities fraud claim based on a code of ethics because "a code of ethics is inherently aspirational; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory." In Andropolis, as here, the code was in effect while executives simultaneously violated it. The court noted that the plaintiffs were not without recourse because they could sue for breach of fiduciary duty. Id.; see also In re Constellation Energy Grp., Inc. Sec. Litig., 738 F. Supp. 2d 614, 631 (D. Md. 2010) (dismissing omission claim based on optimistic statements regarding internal controls; "[s]imply because risk management and internal controls are important to Constellation's business, it does not follow that any individual statement regarding these topics is per se material."); In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 160-61 (D. Mass. 2009) (dismissing "generalized claims of mismanagement" based on "generalizations regarding integrity, fiscal

1    discipline and risk management" where internal controls were allegedly inadequate because such

2    claims are not actionable under securities laws).

3            Similarly, in <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase</u>

4    <u>Co.</u>, 553 F.3d 187, 205–06 (2d Cir. 2009), the plaintiffs alleged that JP Morgan Chase ("JPMC")

5    made numerous misrepresentations regarding its "highly disciplined" risk management and its

6    standard-setting reputation for integrity "because JPMC's poor financial discipline led to liability

7    in the WorldCom litigation and involvement in the Enron scandal," giving rise to the plaintiffs'

8    claims.  <u>Id.</u>  The Second Circuit rejected that argument, noting that the plaintiffs misinterpreted the

9    puffery doctrine: "Plaintiffs conflate the importance of a bank's reputation for integrity with the

10   materiality of a bank's statements regarding its reputation.  While a bank's reputation is

11   undeniably important, that does not render a particular statement by a bank regarding its integrity

12   per se material."  The court concluded that JP Morgan Chase's statements "did not, and could not,

13   amount to a guarantee that its choices would prevent failures in its risk management practices."

14   <u>Id.</u> at 206.  Indeed, "[n]o investor would take such statements seriously in assessing a potential

15   investment, for the simple fact that almost every investment bank makes these statements.

16   Finding that JPMC's statements constitute a material misrepresentation would bring within the

17   sweep of federal securities laws many routine representations made by investment institutions."

18   <u>Id.</u>

19           Plaintiff attempts to distinguish these authorities on the ground that, after the 2006 scandal,

20   investors would have been looking for publicly available information to determine whether HP

21   had put that scandal behind it.  To Plaintiff, the 2008 and 2010 SBCs are exactly that kind of

22   information.

23           The Court finds this distinction unpersuasive.  Adoption of the Plaintiff's argument here

24   would still render every code of ethics materially misleading whenever an executive commits an

25   ethical violation following a scandal, in contravention of the authorities just cited.  Moreover,

26   notwithstanding the 2006 scandal, it remains the case that the statements Plaintiff identifies as

27   material misrepresentations in the SBCs are "so general that a reasonable investor would not

28   depend on [them] as a guarantee that [HP] would never take a step that might adversely affect its

United States District Court
Northern District of California

1    reputation." <u>ECA, Local 134</u>, 553 F.3d at 206.

2          Plaintiff relies on the decision in <u>Ross v. Career Educ. Corp.</u>, No. 12-cv-276, 2012 WL

3    5363431, at *7 (N.D. Ill. Oct. 30, 2012), but the distinction between the facts in <u>Ross</u> and the facts

4    here underlines how Plaintiff has failed adequately to plead materiality.  In Ross, the defendant

5    CEC was a private college that misrepresented the placement rates of its graduates, *i.e.* the rates at

6    which CEC graduates found employment in a field of their choosing.  <u>Id.</u>, at *1, 3.  After these

7    misrepresentations were discovered, CEC made public statements that it had changed its practices

8    and put its past troubles behind it.  Importantly, unlike the generalized ethics codes at issue here,

9    CEC issued statements specifically stating that it had changed its conduct with respect to its

10   reported placement rates — statements that turned out not to be true.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at *6 ("CEC's

11   company spokesman's May 2011 statement regarding a new compliance culture: '[W]e have

12   carefully reviewed and modified our policies and practices for reporting job placement rates,

13   admissions and advertising.'").  The court in <u>Ross</u> concluded: "Given the nature of [the

14   defendants'] tainted past, defendants' statements about the company's current status — that it had

15   eliminated its significant regulatory issues — could have misled a reasonable investor to believe

16   that [it] had remedied the practice that led to those problems — the company's alleged improper

17   reporting of [job] placement rates."  <u>Id.</u>  Here, there is no analogous relationship between the prior

18   misconduct at HP, Defendant Hurd's conduct, and the generalized statements contained in the

19   SBCs.

20          Finally, Plaintiff argues in the alternative that puffery can become actionable regardless of

21   whether it is material when (1) the statement is not actually believed, (2) there is no reasonable

22   basis for the belief, or (3) "the speaker is aware of undisclosed facts tending seriously to

23   undermine the statement's accuracy."  <u>Kaplan v. Rose</u>, 49 F.3d 1363, 1375 (9th Cir. 1994).  That

24   rule, as stated in <u>Kaplan</u>, keys on the PSLRA's safe harbor provision relating to financial

25   projections, and applies only where the defendant has made "[a] projection or statement of belief."

26   <u>Id.</u>  <u>See</u> <u>generally</u> <u>Marx v. Computer Sciences Corp.</u>, 507 F.2d 485, 489 (9th Cir. 1974) (setting

27   forth test).  That is because financial projections are "capable of objective verification."  <u>In re</u>

28   <u>Cornerstone</u>, 355 F. Supp. 2d at 1087.  But the court in <u>Kaplan</u> also reiterated that the false or

1    misleading statement itself must be material.  Kaplan, 49 F.3d at 1381 ("[a] plaintiff who shows

2    reliance under the theory that the market relied on a misrepresentation or omission must also

3    establish materiality").  Plaintiff has not cited any authority applying Kaplan's holding cases

4    outside to does not cite to any authority holding that the rule it relies upon (1) applies outside the

5    context of financial projections, or (2) absolves it of the materiality requirement.[1]

6          Courts have repeatedly held that "'no matter how untrue a statement may be, it is not

7    actionable if it is not the type of statement that would significantly alter the total mix of

8    information available to investors.'"  Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D.

9    Cal. Mar. 31, 1998).  Here, the 2008 and 2010 SBCs are not projections of future conduct, nor are

10   they financial.  They are not specific, nor do they suggest, expressly or impliedly, that CEO Hurd

11   was in compliance with them at the time they were published.  And, to the extent that they do

12   outline specific ethical rules, those rules are unrelated to the 2006 scandal.  The SBCs are codes of

13   ethics, directed to employees, that, at most, constitute puffery — if the market was even aware of

14   them.

15         The Court concludes that neither the 2008 and 2010 SBCs, nor any alleged omissions from

16   them, were material.

17         **2.  The Risk Disclosures Regarding Executive Retention Were Not Material**

18         HPs statements concerning executive retention are not actionable either.  In relevant part,

19   Plaintiffs allege that the HP Forms 10-K and 10-Q filed during the class period stated as a risk

20   factor: "The failure to hire executives and key employees or the loss of executives and key

21   employees could have a significant impact on our operations."  Again, Plaintiff conflates the

22

23   [1] Plaintiff also cites Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006) as a
     case in which the publication of statements "noting Goldman's high ethical standards and its
24   compliance with industry rules and regulations" was deemed to be actionable.  Id. at 228–29.  In
     Lapin, the alleged non-disclosure concerned conflicts of interest that allegedly biased analysts'
25   opinions in preparing Goldman's equity research reports.  Id. at 229.  In Lapin, however, as in
     Ross, the evidence before the court also included statements that specifically denied the
26   wrongdoing at issue.  Id., at 229 (Goldman touted its "insightful, *unbiased* research (emphasis
     added)).  Thus, Lapin does not stand for the proposition that the publication of a general statement
27   of ethical standards, without more, is a basis for liability.

28

materiality of statements concerning whether Hurd would, *in fact*, remain at HP with the materiality of vague and routine statements concerning the retention of executives in general.  For the reasons discussed at length above, those statements are not material.

Moreover, even if they were material, the risk factor statements were not false, nor did they create a duty to disclose Hurd's alleged violations of the code of ethics.  Just as the risk disclosure in FoxHollow, cited by HP, was insufficiently specific to render it material and actionable, the disclosure here, if anything, suggests that some personnel might leave, not that Hurd would stay. See In re FoxHollow Techs., Inc. Sec. Litig., No. 06-cv-4595-PJH, 2008 WL 2220600, at *18–19 (N.D. Cal. May 27, 2008), aff'd, 359 F. App'x. 802, 805, n.1 (9th Cir. 2009) ("[T]he risk disclosure statements cited by plaintiff [would not] have reasonably led anyone to conclude that FoxHollow intended to retain management.  Instead, the statements convey the opposite impression — that FoxHollow's management was subject to change, that personnel might be replaced, and that investors should be aware of that possibility.").

## B.    Falsity

In pleading falsity, securities fraud plaintiffs face "no small hurdle," as they must satisfy the dual heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA. In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012).  See Zucco Partners, LLC v. Digimarc Corp., supra, 552 F.3d at 990 (9th Cir. 2009).  Securities fraud plaintiffs will survive a motion to dismiss only if they "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Here, Plaintiff does not meet that exacting standard.  Separate and apart from whether Plaintiff has identified statements that are material to investors, Plaintiff also fails to identify statements that are false or misleading because it does not adequately explain how the SBCs are false or misleading.  Instead, Plaintiffs argue in general terms that Hurd was engaging in unethical conduct at the time the SBCs were promulgated.

Plaintiff provides insufficient detail with respect to the conduct Hurd allegedly engaged in

13

to enable the Court to determine (1) what the conduct was, (2), which provisions of the SBCs the conduct violated, or (3) when the conduct occurred. Moreover, Plaintiff fails to identify a section of the SBCs that would be rendered false or misleading had Hurd, at the time the SBCs were promulgated, been violating them. Instead, Plaintiff points to a litany of ethical guidelines that state only what HP's ethical policies were, not whether HP's employees were in compliance with them at the time. Insofar as Plaintiff argues that the former implies the latter, the decisions discussed above with respect to materiality foreclose that argument.

### C.   Scienter

The PSLRA's heightened scienter standard requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193–94 n. 12 (1976). Deliberate or conscious recklessness constitutes intentional conduct sufficient to satisfy the scienter requirement. "[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), abrogated on other grounds by South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." Gebhart v. SEC, 595 F.3d 1034, 1042 (9th Cir. 2010).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, 552 F.3d at 991. In evaluating

United States District Court
Northern District of California

1    whether a complaint satisfies the "strong inference" requirement, courts must consider the

2    allegations and other relevant material holistically, not "scrutinized in isolation."  In re VeriFone

3    Holdings, 704 F.3d at 701.

4                    **1.   Scienter as to Hurd**

5              Because Plaintiffs have not alleged any facts independently establishing that Hurd knew

6    his conduct would have the effect of misleading investors, the Court cannot evaluate the parties'

7    arguments concerning scienter without the benefit of allegations that satisfy the materiality

8    requirement.  To be sure, Plaintiff has alleged that Hurd purposefully kept the nature of his

9    relationship with Jodie Fisher a secret, at least from some people.  But the parties' briefing on this

10   point misses the mark.  Standing alone, those allegations give rise only to the inference that Hurd

11   did not want his allegedly unethical conduct known.  Wanting to keep something secret, in and of

12   itself, is insufficient to implicate the PSLRA.  Hurd's conduct rose to the level of securities fraud

13   only if, when he promulgated the SBCs and signed the SEC filings, he either intended to mislead

14   investors or knew (or should have known) that failing to disclose his conduct would artificially

15   inflate HP's stock.  See S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1092 (9th Cir.

16   2010) ("[S]ome degree of subjective understanding of the risk of misleading others is required.").

17   Plaintiff has therefore inadequately alleged the scienter requirement, because nothing suggests that

18   Hurd thought that he could mislead investors with the statements the Court finds were immaterial.

19             On the other hand, addressing solely the issue of materiality, and assuming the Court had

20   determined that the statements and omissions at issue were material, it is probable that the Court

21   would reach a different conclusion as to the scienter requirement with respect to Hurd.  Hurd

22   obviously knew of his own conduct.  See Platforms Wireless, 617 F.3d at 1094 ("When the

23   defendant is aware of the facts that made the statement misleading, he cannot ignore the facts and

24   plead ignorance of the risk.") (quotation omitted).  Also, Plaintiff alleges that Hurd took steps to

25   conceal and cover-up his misconduct, i.e., by initially misleading the board's investigators,

26   attempting to suppress disclosure of Fisher's letter, and silencing Fisher through a private

27   settlement.  FAC ¶¶ 84–86; see In re Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301,

28   1311 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong

United States District Court
Northern District of California

15

proof of scienter"); In re Connetics Corp. Sec. Litig., No. 07 Civ. 2940, 2008 WL 3842938, at *15 (N.D. Cal. Aug. 14, 2008) (strong inference of *scienter* based on efforts to conceal stock sales). Plaintiff also alleges that Hurd resigned upon revelation of his misconduct (¶¶ 41–42, 85), a fact that "provides minimal, non-dispositive supporting evidence of scienter." In re Impax Labs., Inc., Secs. Litig., 2007 WL 7022753 (N.D. Cal. July 18, 2007). Taken as a whole, and assuming Plaintiff were able to satisfy the materiality requirement, these factual allegations support a reasonable belief of Hurd's knowledge of false or misleading statements that were either reckless or intended to defraud.

### 2. Scienter as to HP

Plaintiff's claims against HP suffer from the same defects regarding materiality, and therefore the same defects regarding scienter, as its claims against Hurd. Moreover, Plaintiff does not argue[2] that HP itself knew of Hurd's allegedly unethical conduct, nor does Plaintiff identify any statements made by HP employees or officers other than Hurd as the basis of its securities fraud claims. Instead, Plaintiff argues that Hurd's knowledge at the time of the promulgation of the SBCs and the inclusion of the risk factor section of the Forms 10-K and 10-Q can be imputed to HP.

The essence of Plaintiff's argument is that HP is liable under the doctrine of respondeat superior, which provides for the employer's liability for the wrongful acts of its employees undertaken within the scope of employment. See Restatement (Third) of Agency§ 2.04 (2006); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990) (en banc), cert. denied, 499 U.S. 976 (1991) (respondeat superior available in securities fraud cases in addition to section 20(a) controlling person liability).

HP responds that imputation here would be inappropriate, invoking the "adverse interest" exception to the imputation rule. HP argues that it is entitled to avoid imputation of Hurd's

---

[2] The First Amended Complaint contained a single reference to a speech made by HP's Chief Ethics and Compliance Officer, Jon Hoak, FAC ¶ 55, but Plaintiff does not attempt to argue that the speech was misleading or material, nor does Plaintiff allege that it was literally false, or that Hoak made the statement with the requisite state of mind to sustain a PSLRA claim. The Court assumes that Plaintiff has abandoned any claim with respect to Hoak's speech.

United States District Court
Northern District of California

*scienter* because "Hurd's purported conduct was adverse to HP." ECF No. 36 p. 23.  Under the adverse interest exception, dismissal of the corporation from a securities fraud action is warranted where the only corporate agent who may supply the requisite scienter was acting completely adversely to the company's interests.  See In re ChinaCast Educ. Corp. Sec. Litig., CV 12-4621-JFW PLAX, 2012 WL 6136746 (C.D. Cal. Dec. 7, 2012); In re Apple Computer, Inc., 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) (quoting In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 225, 232 (D.N.J. 2000)).  As the court said in Cendant:

> The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so.  But the legal presumptions ought to be logical inferences from the natural and usual conduct of [people] under the circumstances.  But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.

Cendant, 109 F. Supp. 2d at 232.

The court declines to hold that HP is entitled to invoke the adverse interest exception at this stage of the litigation.  The Court cannot say at this stage of the case that HP is entitled to prevail on this defense as a matter of pleading, as opposed to a matter of evidence.  The adverse interest exception is narrow and generally requires "an agent to *completely* abandon the principal's interests and act *entirely* for his own purposes."  USACM Liquidating Trust v. Deloitte & Touche LLP, 764 F. Supp. 2d 1210, 1218 (D. Nev. 2011) (emphasis added), aff'd sub nom. USACM Liquidating Trust v. Deloitte & Touche, 11-15626, 2013 WL 1715532 (9th Cir. Apr. 22, 2013). See, e.g., In re CBI Holding Co., Inc., 529 F.3d 432, 448 (2d Cir.2008); In re Crazy Eddie Secs. Litig., 802 F.Supp. 804, 817 (E.D.N.Y.1992) (when agent acts both for himself and for principal, agent's knowledge is imputed to principal even if agent's primary interest is inimical to principal). In other words, the agent's relations to the subject matter must be "so adverse as practically to destroy the relation of agency."  3 Fletcher Cyclopedia of Private Corp. § 789.  "Courts generally require total abandonment to invoke the adverse interest exception because '[t]his rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases-outright theft or looting or embezzlement — where the

17

1    insider's misconduct benefits only himself or a third party . . . ." USACM Liquidating Trust, 764

2    F. Supp. 2d at 1218 (quoting Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466–67 (2010)).

3            Determining whether "this most narrow of exceptions" applies, and whether the

4    Defendants' relations to the subject matter were "so adverse as practically to destroy the relation

5    of agency" are questions of fact not contained within the four corners of Plaintiff's allegations.

6    The burden of proving the exception will fall to HP.  The Court will not resolve it on a motion to

7    dismiss.  See Webceleb, Inc. v. Procter & Gamble Co., 10CV2318 DMS NLS, 2012 WL 460472

8    (S.D. Cal. Feb. 13, 2012) (questions of fact inappropriate for resolution on motion to dismiss);

9    Great Am. Ins. Co. v. Chang, 12-00833-SC, 2012 WL 3660005 (N.D. Cal. Aug. 24, 2012) (factual

10   disputes not resolvable on motion to dismiss); Giannini v. Am. Home Mortgage Servicing, Inc.,

11   C11-04489 TEH, 2012 WL 298254 (N.D. Cal. Feb. 1, 2012) (inappropriate for court to base

12   dismissal on affirmative defense).[3]

13           **D.    Causation**

14            In securities fraud cases, plaintiffs must plead and prove the "causal connection between

15   the material misrepresentation and the loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336,

16   342 (2005).  Plaintiff must plead "both transaction causation, that the violations in question caused

17   the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or

18   omissions caused the harm." In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005) (quoting

19   Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017, 1026 (9th Cir. 1999)).  Loss causation

20   can only be established if the plaintiff shows "that the misstatement or omission concealed

21   something from the market that, when disclosed, negatively affected the value of the security.

22   Otherwise, the loss in question was not foreseeable." Lentell v. Merrill Lynch & Co., Inc., 396

23   F.3d 161, 173 (2d Cir. 2005).  Stated differently, plaintiffs will survive a motion to dismiss if they

24   allege that the defendant's 'misstatements and omissions concealed the price-volatility risk (or

25

---

[3] Plaintiff also argues that the adverse interest exception cannot apply as against innocent third parties.  Because HP has not established that the adverse interest exception applies to the complaint's allegations at this stage of the litigation, the Court does not reach the question of whether it applies to innocent third parties.

United States District Court
Northern District of California

1   some other risk) that materialized and played some part in diminishing the market value of" the

2   security." In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534, 547 (N.D. Cal. 2009) (quoting

3   Lentell, 396 F.3d at 177).

4           Hurd argues that Plaintiff fails to allege loss causation because Hurd's resignation was not

5   causally linked to the concealment, and ultimate disclosure, of his conduct. Hurd's argument

6   conflates materiality and causation. Plaintiff adequately alleges that Hurd's resignation "both

7   revealed the falsity of [his] prior statements and was a materialization of the previously

8   undisclosed risks" of which he was aware. In re MannKind Sec. Actions, 835 F. Supp. 2d 797,

9   815 (C.D. Cal. 2011).

10          Plaintiff also adequately alleges that it purchased the security at artificially inflated prices,

11  and that the security readjusted to a lower, more accurate level following the materialization of the

12  risk, causing Plaintiff to lose money. That allegation is sufficient if "the failure to disclose th[e]

13  fact caused [the] injury through [the plaintiff's] undervaluation of the risk it was undertaking in

14  accepting the [investment]." Charles Schwab, 257 F.R.D. at 547 (quoting Caremark, Inc. v.

15  Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir.1997)). Though Plaintiff may ultimately fail

16  to prove causation, it is entitled to allege loss causation as it has done here.

17          That Hurd could have resigned for any other reason does not alter the analysis. "By

18  arguing what might have been, defendants seriously distort general principles of causation."

19  Ambassador Hotel, 189 F.3d at 1029. Hurd's argument that violating the SBCs did not

20  necessarily include the risk of resignation is also unavailing; the violation of ethical codes

21  necessarily carries with it the risk of termination — a risk sufficient to sustain Plaintiff's causation

22  allegations at the pleading stage. Finally, Hurd may be correct that the Board would have retained

23  him but for his initial refusal to tell the Board the truth about Jodie Fisher. That factual dispute is

24  also premature at this stage.

25          Plaintiff alleges that the stock price dropped because Hurd resigned, and that Hurd

26  resigned because his unethical conduct was revealed to the Board after he concealed it from the

27  public. That is sufficient, provided Hurd concealed his conduct in a manner that involved making

28  material misstatements or omissions to the public. Because here the omissions were not material,

19

1   Plaintiff's claim must fail, not because Plaintiff fails adequately to allege loss causation, but

2   because of the failure to establish materiality.

3      **E.**  **Plaintiff's Derivative Section 20(a) Claim Fails**

4      Section 20(a) of the Exchange Act, which forms the basis of Plaintiff's second cause of

5   action against Defendant Hurd, extends liability to persons who directly or indirectly control a

6   violator of the securities laws.  15 U.S.C. § 78t(a).  A claim under section 20(a) can only survive if

7   the underlying predicate Exchange Act violation also survives.  See Howard v. Everex Sys., Inc.,

8   228 F.3d 1057, 1065 (9th Cir. 2000).  Because the Court dismisses Plaintiff's Exchange Act claim,

9   Plaintiff's second cause of action must also be dismissed.

10  **V.**  **CONCLUSION**

11     Because Plaintiff's claims are based on alleged misrepresentations that are not material,

12  and on allegations that fail to establish falsity or scienter as to Hurd, Plaintiff has not stated a

13  claim for relief under the Exchange Act, either under section 10(b) or 20(a).

14     The Court hereby DISMISSES Plaintiff's First Amended Complaint.  Plaintiff may amend

15  the complaint in a manner consistent with the terms of this Order within 30 days from the date of

16  this Order.[4]

17     **IT IS SO ORDERED**.

18  Dated:  August 9, 2013

19

20                   JON S. TIGAR
                 United States District Judge

21

22

23

24

25

26

27  _____
  [4] If Plaintiff does not intend to amend its complaint, it must either voluntarily dismiss this action

28  or file a notice of submission to the Court's ruling within 30 days of the date of this Order.

United States District Court
Northern District of California