UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETAIL WHOLESALE & DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND,<br><br>Plaintiff,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY, et al.,<br><br>Defendants. | Case No.  12-cv-04115-JST<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: ECF Nos. 68, 70 |

The Court previously dismissed Plaintiff's securities fraud complaint against Defendants Hewlett Packard Co. ("HP") and its former Chairman, President, and CEO, Mark Hurd, for failure to state a claim under the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  ECF No. 63.  Plaintiff then filed a Second Amended Complaint, which Defendants now move to dismiss.  Because the Second Amended Complaint still fails to adequately allege materiality and falsity, the Court will grant Defendants' motions without leave to amend.

**I.    FACTUAL ALLEGATIONS[1]**

Lead Plaintiff Retail Wholesale & Department Store Union Local 338 Retirement Fund's Second Amended Complaint, ECF No. 65 ("SAC"), alleges that HP and its former Chairman, President, and CEO Mark Hurd committed securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission, 17 C.F.R. § 240.10b-5.  The SAC was filed on behalf of a class of shareholders who purchased HP stock between November 13, 2007, and

---

[1] HP's unopposed request for judicial notice of NYSE Rule 303A.10 is GRANTED.  See Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001).

August 6, 2010 ("the class period"), and who held the shares as of August 6, 2010.

The gist of the SAC is that HP and Hurd made material misrepresentations when HP adopted its "Standards of Business Conduct" ("SBC") without disclosing that Hurd was violating the SBC by submitting false expense reports and making unwanted sexual advances on an HP contractor. Many of the specifics of these allegations are recited in the Court's prior order. ECF No. 63.

### A. The 2006 Scandal

The SAC alleges that the events leading up to the current alleged misrepresentations began in 2006, when HP became embroiled in an ethics scandal. SAC ¶ 3. Several HP executives and board members were involved in an unethical investigation into potential information leaks at the company. Id. Not only were several executives and board members ousted as a result, but HP's then-Chairman and General Counsel were both prosecuted for their roles in the scandal. Id. ¶ 32.

Hurd had become CEO in 2005 but was not implicated in the scandal; instead, "he emerged with his reputation for integrity not only intact, but made all the stronger for it." Id. ¶ 32. Notwithstanding the scandal, HP's shares "remained buoyant" during the scandal because of the concurrent increase in the profitability of its main business and increased market share. Id. ¶ 33. Wall Street generally approved of Hurd's efforts "to reshape the management team, improve morale and cut costs," as well as his implementation of strategies that resulted in HP's increase in market share. Id. However, when Hurd was temporarily implicated in September 2006 as a potential target in the scandal, HP's stock price dropped 5.19 %. Id. ¶ 34.

### B. HP's Reaction to the 2006 Scandal

The SAC alleges that in the wake of the scandal, HP took certain measures, including making statements and eventually promulgating an updated SBC to restore shareholders' trust. "HP made its statements regarding the SBC for the specific purpose of reassuring investors of HP's compliance with ethical standards." Id. ¶ 46. Plaintiff alleges "[t]hese statements were false and misleading in that they implied that the obligation to adhere to HP's ethics standards applied to all employees, including Hurd, and that Hurd by endorsing these standards was in fact in compliance with them." Id. ¶ 49.

For example, the SAC alleges that in the wake of the scandal, HP's management sent a letter to employees emphasizing that "the board is fully confident in [Hurd's] commitment to the highest standards of governance," "[a]ny violations of our standards are unacceptable to Hewlett-Packard and we will take appropriate action," and "[b]e assured we will do what is needed to move through this and continue our work to build the world's leading information technology company." Id. ¶ 36. Hurd also made public statements that "[t]he company will work to put these matters behind us . . . to earn the trust and support of our . . . stockholders," and "our ethics policy [] appl[ies] to all employees and all board members." Id. ¶ 37. Further, Hurd emphasized in front of the House Committee on Energy and Commerce that "HP is a company that has consistently earned recognition for our adherence to standards of ethics, privacy and corporate responsibility," and "I am responsible for the company, which means I am responsible for fixing it and leading it forward through this hard time." Id. ¶ 38.

HP also entered into an agreement settling claims that had been asserted by shareholders in derivative actions filed in response to the scandal. Id. ¶ 40. Under the terms of the settlement, HP agreed to appoint a Lead Independent Director who ensures compliance of the SBC and reports violations, appoint a Chief Ethics and Compliance Officer who reports violations, establish a compliance committee, enhance HP's ethics and training program, and clarify that the SBC applies to all personnel. Id. In addition, this Chief Ethics and Compliance Officer claimed that HP's new vision for ethics and compliance is a "competitive advantage" and set forth action items to rebuild HP's reputation. Id. ¶ 51. These items included revising the SBC and enhancing the HR process related to the SBC, including holding employees at all levels accountable. Id.

In 2008, HP published its updated SBC, which was available on the investor-relations portion of HP's website and incorporated in its 10-K annual reports and Schedule 14A proxy statements. Id. ¶ 41. The SBC opened with a message from Hurd, making clear that the SBC applied to all HP employees, up to and including the board members. Id. The SBC included the following statements, which Hurd is alleged to have violated: "use your good judgment, the Headline Test, and the supporting decision-making model to work through situations where the right course of action isn't clear"; "report any alleged misconduct immediately"; "cooperate with

3

all internal investigations and audits"; "tell the whole truth when responding to an investigation or audit"; "[d]o not discriminate on the basis of race, color, religion, gender, sexual orientation, gender identity or expression, national origin, disability, age, covered veteran status, or any other characteristic protected by law"; "do not behave in a disrespectful, hostile, violent, intimidating, threatening, or harassing manner"; "encourage a harassment-free work environment"; "[r]efuse to accept or tolerate sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature"; "keep personal use of HP assets to a minimum"; "do not allow other people, including friends and family, to use HP resources"; "avoid any use that may lead to loss and damages"; "uphold your responsibility to protect HP financial assets"; "create business records that accurately reflect the truth of the underlying transaction or event"; "make decisions in the best interest of HP"; "discuss with your manager any situation that could be perceived as a potential conflict of interest"; "provide and accept gifts, favors, and entertainment only if they are reasonable complements to business relationships"; "use and disclose HP sensitive information only for valid business purposes"; "share sensitive information outside of HP only with authorized parties who have signed a confidential disclosure agreement"; "[d]o not trade or tip others to trade using material inside information about HP or an HP business partner"; "[w]e are open, honest, and direct in all our dealings"; "[w]e develop leaders at all levels who achieve business results, exemplify our values, and lead us to grow and win"; and "[e]ngage in open and honest communication in all your business." Id. ¶ 50.

Moreover, in HP's 10-K and 10-Q filings with the SEC throughout the class period, HP stressed the importance of retaining key personnel, stating: "The failure to hire executives and key employees or the loss of executives and key employees could have a significant impact on our operations." Id. ¶ 39.

### C.     Hurd's Alleged Scandal and Departure

HP retained Jodie Fisher as an independent consultant in the fall of 2007 to help host executive events and to introduce Hurd to important HP customers at hotel receptions around the world. Id. ¶ 12. Hurd and Fisher met in this capacity in numerous cities around the world from

4

autumn 2007 to autumn 2009, when for reasons that are unclear, Fisher stopped contracting with HP. Id.

On June 29, 2010, Fisher's attorney sent HP a letter alleging that Hurd had sexually harassed Fisher and that her contract was terminated because she refused his sexual advances. Id. ¶ 60. The letter also alleged that in March 2008, Hurd disclosed to Fisher HP's plans to acquire Electronic Data Systems ("EDS") at a time that the information was confidential. Id. ¶ 65. HP's Board of Directors immediately initiated an internal investigation into the allegations. Id. ¶ 69. Its results were presented to the Board on July 28, 2010. Id. ¶ 73. The investigation revealed that Hurd had filed inaccurate expense reports, and that there were factual inaccuracies in the account Hurd initially gave to the Board regarding the allegations. Id. Hurd initially claimed not to know Fisher well, and to be ignorant of her prior career in adult films. Id. ¶ 70. The investigation revealed, however, both that Hurd was aware of her prior career and that, as he eventually admitted, he and Fisher had a "very close personal relationship." Id.

The investigation did not reveal evidence supporting Fisher's allegations concerning sexual harassment or insider trading with respect to the EDS acquisition; however, the investigators did not interview Fisher or her attorney. Id. ¶ 72. On July 29, 2010, the Board agreed to disclose Fisher's allegations to the public as well as part of the investigation's results, "having concluded that Hurd had irreparably comprised [sic] the board's trust by misleading directors." Id. ¶ 74. HP announced Hurd's resignation on August 6, 2010. Id. ¶ 75. The press release included a statement from Hurd in which he stated: "I realized there were instances in which I did not live up to the standards and principles of trust, respect and integrity that I have espoused at HP and which have guided me throughout my career . . . ." Id. ¶ 76. At that time, HP's General Counsel revealed some of the investigation's findings, including that Hurd hired Fisher without disclosing their personal relationship to the Board, that there were numerous instances in which Fisher received compensation or expense reimbursement where there was not a legitimate business purpose, and that Hurd submitted numerous inaccurate expense reports that were intended to or had the effect of concealing his relationship with Fisher. Id. ¶ 78.

Wall Street and the press reacted strongly to Hurd's departure. One Wall Street Journal

article stated: "'The scandal brought to a surprising end the tenure of a CEO who has placed great emphasis on upgrading H-P's ethics standards. Mr. Hurd had pledged to make the company's code of business conduct stronger following a 2006 boardroom investigation that triggered the departure of then-HP chairwoman Patricia Dunn.'" Id. ¶ 93. HP's share price fell 8.2 % on the first trading day after the announcement, and one week later had dropped 12.6 %. Id. ¶ 94. On the day of the announcement, HP's stock was trading at approximately $46 per share. Id. By the end of 2012, it traded at approximately $14 per share, a 69 % decline. Id. ¶ 95. An April 27, 2011 article concluded: "'it seems safe to say that Hurd's departure from HP has cost the company's shareholders at least $10 billion and probably a lot more.'" Id.

### D. Alleged Securities Fraud

Plaintiff alleges that prior to and throughout the class period, Defendants made representations regarding ethical standards with which HP's employees and officers supposedly complied. Id. ¶ 44. These representations were material because they implied that the obligation to adhere to HP's ethics standards applied to all employees, including Hurd, and that Hurd by endorsing these standards was in fact in compliance with them. Id. ¶ 49. These statements were allegedly false and misleading due to Defendants' failure to disclose that Hurd was contemporaneously engaged in knowing SBC violations that warranted his ouster. Id. ¶ 44.

Plaintiff alleges that during the class period, Hurd knew or recklessly disregarded the fact that his dealings with Fisher violated the standards set forth in the SBC and the HP policies that preceded the SBC. Id. ¶ 20. Moreover, Hurd knew or recklessly disregarded that he submitted inaccurate expense reports, and that his falsification of business records not only violated the SBC, but raised a material risk that he would be dismissed from his job. Id.

Plaintiff alleges that the non-disclosure of Hurd's SBC violations during the class period fraudulently inflated the price of HP's shares. Id. ¶ 21. Unbeknownst to investors, Hurd was engaged in misconduct that exposed HP to material liabilities and raised material risks to Hurd's continued tenure as HP's CEO. Id. Because Hurd's conduct threatened the stability of HP's leadership structure, it undermined HP's ability to build upon prior success and meet earnings estimates, thus threatening HP's stock price. Id. The fraudulently concealed risks ultimately

1  materialized, injuring investors.  Id. ¶ 22.  HP's stock price fell sharply in response to the

2  disclosure of Hurd's ethical misconduct, SBC violations, and resulting resignation.  Id.

## II.     LEGAL STANDARDS

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. den'd, 132 S. Ct. 2101 (2012).

In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In the Ninth Circuit, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible."  Starr, 652 F.3d at 1216.

Securities fraud plaintiffs must satisfy both Rule 9(b) and the requirements of the PSLRA.  In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012).  The PSLRA establishes uniform and stringent pleading requirements for securities fraud actions, and was designed to end the practice of pleading "fraud by hindsight."  See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 958 (9th Cir. 1999).  A securities fraud plaintiff must plead both falsity and scienter with particularity.  See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court

must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

## III.   ANALYSIS

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b).  To state a claim for violation of section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

HP moves to dismiss the SAC on the grounds that the SBC is not actionable because it is not material.  HP also argues that dismissal is necessary because Plaintiff has failed to plead falsity and scienter.  Hurd moves to dismiss on the grounds that the SBC is not actionable, and that Plaintiff fails adequately to plead scienter and loss causation.

There are two aspects to Plaintiff's alleged cause of action: (1) the SBC and Defendants' other public representations regarding corporate ethics are materially false because of Hurd's non-compliance with the SBC, and (2) Hurd's concealment of his non-compliance, against the backdrop of these public statements, is a materially false omission.  Sometimes, Plaintiff focuses on the former.  See, e.g., SAC ¶¶ 81–92 (alleging various SBC provisions and Hurd's statements, and how they were "rendered materially false" by Hurd's non-compliance); Plaintiff's Opposition Brief, ECF No. 73, 7:4–8:13, 10:6–11:21 (same).  At other times, Plaintiff highlights the latter.  See, e.g., id. 17:1–21:6 (alleging Defendants' statements and Hurd's violations, and why the violations are material).  Both claims fail because they do not adequately plead materiality or falsity.

For a statement or omission to be actionable under section 10(b) of the Exchange Act, it must be both material and misleading.  A statement or omission is material under section 10(b) and the PSLRA if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 425 U.S. 438, 449 (1976).  And

the statement or omission is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted).

The Court previously dismissed the First Amended Complaint because Plaintiff had failed adequately to allege that the SBC contained material misrepresentations, or that Hurd's concealment of his conduct constituted a fraudulent omission. The SAC does not cure these problems.

Plaintiff argues that the SAC rectifies the pleading deficiencies of the First Amended Complaint because Plaintiff has provided more detail concerning Hurd's conduct, and how his conduct violated the SBC. But the Court's prior Order was not based on Plaintiff's failure to plead Hurd's *conduct* with particularity; it was based on Plaintiff's failure to identify an actionable *representation*. Similarly, while Plaintiff has provided additional details concerning the content of the SBC, those details are similar in kind to the allegations in the First Amended Complaint. The bottom line is that the SBC is an ethical code of the kind the Court previously found not to be actionable, and the SAC does not identify any representation by HP or Hurd that amounts to a warranty of ethical compliance with the SBC. Accordingly, Plaintiff has not stated a securities law violation.

**A.    HP's SBC and Related Representations as the Misrepresentation**

The SBC is a code of ethics. The Court previously held, in dismissing the First Amended Complaint, that the SBC and related representations concerning corporate ethics do not constitute an actionable misrepresentation because they are not material. See ECF No. 63 at 8:21–13:13. In so holding, the Court relied on a long line of decisions where violations of a company's code of ethics were found not to be actionable under the Exchange Act. See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205–06 (2d Cir. 2009) (holding that defendant's statements regarding its "highly disciplined" risk management and its standard-setting reputation for integrity "did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices"); Desai v. Gen. Growth Properties, Inc., 654 F. Supp. 2d 836, 857 (N.D. Ill. 2009) (rejecting plaintiffs' argument that the

defendant's publication of its code of ethics constituted a material omission by executives who were, at the same time, violating the code). The basis for these decisions, and of the Court's prior order, is that "a code of ethics is inherently aspirational; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory." Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007).

Here, the allegations are not meaningfully distinguishable from those in the above-cited cases, or from those in the prior complaint. For the SBC and related representations to have constituted material misrepresentations, a reasonable investor would reasonably have to have believed that they constituted not just an aspirational statement of intention, but a warranty that HP and Hurd were compliant. Otherwise, they cannot "affect the total mix of information and thereby mislead a reasonable investor.'" ECF No. 73 at 18 (citing S.E.C. v. Homestead Props., L.P., No. SACV09–01331, 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009) (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002))). But the totality of facts, even taken as true and construed most favorably to Plaintiff, does not plausibly suggest that the SBC and related representations constituted a warranty.

Plaintiff argues that Hurd and other managers' public representations tacitly suggested that Hurd had complied with the SBC. At best, however, these representations – such as those stressing the importance of the SBC, HP's "basic principles," and the manner in which HP would treat violations of the SBC – established only that HP aspired to comply with its own policies.[2] Indeed, rather than contemplate that there would be perfect compliance with the SBC, HP's policies contemplated that there might be at least some violations. For example, HP's settlement of the shareholders' derivative actions required it to appoint a Lead Independent Director who

---

[2] Plaintiff also points to Hurd's preamble to the 2008 SBC. The preamble contains statements such as, "Let us commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards embodied within our SBC." These statements are quintessential, non-actionable puffery that add nothing to the SBC. See In re Cutera Sec. Litig., 610 F.3d at 1111 ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers").

10

would report any violation of the SBC to the Board and certain key executives. SAC ¶ 40. Also, the SBC itself urges HP employees to "report any alleged misconduct immediately." Id. ¶ 41.

Plaintiff does cite cases in which courts found actionable various companies' misrepresentations about their compliance with corporate policy. See Opp. Br. at 21:7–22:16. In those cases, however, the statements all related either to compliance with the law (as opposed to a purely company policy) or to a company's core product or service. See, e.g., Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., 719 F.3d 498, 501 (6th Cir. 2013) (statement that pharmaceutical care company's contracts with drug companies were "legally and economically valid arrangements" misled investors because contracts actually involved various illegal activities); In re Am. Apparel, Inc. S'holder Litig., 855 F. Supp. 2d 1043, 1049–50, 1066–67 (C.D. Cal. 2012) (statement that clothing company "made diligent efforts to comply with all employment and labor regulations" and that corporate policy was to "fully comply with its obligations to establish the employment eligibility of prospective employers under immigration laws" misled investors because company actually employed hundreds of illegal immigrants whom it later was required to terminate); Ross v. Career Educ. Corp., No. 12 C 276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (statement by for-profit school operator that "[w]e have carefully reviewed and modified our policies and practices for reporting job placement rates, admissions and advertising" misled investors as it was still misrepresenting its placement rates); Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 229–30 (S.D.N.Y. 2006) (statements by investment bank touting its "unbiased" research was false or misleading because analysts were beset by conflicts of interest). It is not surprising that courts have sometimes found that false representations about the lawfulness of a company's activities or about its core products would be important to a reasonable investor.

Here, however, the SBC provisions at issue are not related to compliance with the law or to HP's core products. Also, unlike the facts in American Apparel, Omnicare, and Ross, HP did not make affirmative representations that it was in compliance with its SBC. The only allegation in this case is that HP made its SBC public and pledged to the market that it would enforce its ethics policies rigorously.

### B. Hurd's Concealment as the Misrepresentation

Plaintiff also alleges that Hurd's concealment of his non-compliance with the SBC was a materially false omission, because it increased the risk that he would be terminated as HP's CEO:

> As a result of Hurd's undisclosed misconduct, investors were unaware that there was a *significant risk* Hurd — who had implemented strategies that were integral in allowing HP to weather the challenging economic environment better than its competitors — would *no longer continue as HP's CEO*. Therefore, by concealing rather than disclosing such risks (and the conduct, which gave rise to those risks), Defendants presented to plaintiff and the Class a misleading picture of HP's prospects for building upon prior success and meeting earnings estimates.

SAC ¶ 119 (emphasis added).

Plaintiff's theory of liability appears to be that a corporation or senior executive is liable whenever that executive is involved in misconduct that might lead to his or her resignation or termination, regardless of the nature of that misconduct, unless the conduct is disclosed. But that is not the law.

For an omission to be actionable, there must be a duty to disclose the underlying non-compliance or misconduct. See Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (internal citation and quotation marks omitted); see also Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (2008) ("materiality alone is not enough to place a duty to disclose").

Since the Court finds that the SBC and the other representations about corporate ethics did not constitute a warranty of compliance, Hurd was not required to disclose his misconduct to make those representations not misleading, because the representations were not material in the first place.[3]

---

[3] Plaintiff's reliance on decisions such as In re Wells Fargo Sec. Litig., 12 F.3d 922, 927 (9th Cir. 1993), is therefore unavailing, because those cases involve material representations coupled with

1    The Court finds that Hurd's concealment of his non-compliance with the SBC was not a
2 materially false omission.

### C. SBC as Competitive Advantage

The SAC alleges that HP's Vice President "described HP's new vision for ethics and compliance as a 'competitive advantage.'" SAC ¶ 51. To rebuild the company's reputation, HP planned to revise the SBC code and hold employees at all levels accountable. Id. Plaintiff argues that these additional representations make the SBC material.

The cases cited by Plaintiff are inapposite. In City of Omaha Police & Fire Retirement System v. LHC Group, Inc., No. 6:12-1609, 2013 WL 1100819, at *3–4 (W.D. La. Mar 15, 2013), for example, the plaintiff successfully alleged a material misrepresentation, but not because the defendants touted their compliance program as a "competitive advantage." Instead, the actionable misrepresentation was the defendants' statement that they were "in compliance with all applicable laws" while they knowingly violated the Social Security Act. Id. As explained above, the totality of facts does not plausibly suggest that the SBC and related representations constitute a compliance warranty. The representation that the SBC constitutes a "competitive advantage" does not tip the scale enough to find the SBC material to a reasonable investor.

Moreover, even assuming that the SBC and related statements were material, the theory that they constitute actionable misrepresentations still fails because the statements were not false. The SBC states HP's aspiration for ethical behavior and promises action when non-compliance is discovered. As soon as HP received the allegations from Fisher's attorney, it promptly conducted an investigation, which culminated in findings adverse to Hurd. He resigned just over a month later. In other words, HP acted in accordance with its representations. Therefore, there is no falsity because HP did not give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." Reese v. BP Exploration (Alaska) Inc., 643 F.3d 681, 691 (9th Cir. 2011).

---

non-disclosure.

### IV. CONCLUSION

Because Plaintiff's claims are based on alleged misrepresentations that are not material or misleading, Plaintiff has not stated a claim for relief under section 10(b) of the Exchange Act. Plaintiff's section 20(a) claim also fails because it must be predicated upon an adequately pled Exchange Act violation. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000) ("In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator."). Because the Court dismisses Plaintiff's section 10(b) claim, it also dismisses Plaintiff's section 20(a) claim.

Plaintiff's Second Amended Complaint is therefore DISMISSED. Because the Court has already given Plaintiff an opportunity to cure the deficiencies in its complaint, the Court concludes that further amendment would be futile, and dismissal is therefore without leave to amend. Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038-39 (9th Cir. 2002).

**IT IS SO ORDERED.**

Dated: June 25, 2014



JON S. TIGAR
United States District Judge

14